CSX CORPORATION, INC., CSX Transportation, Inc., for itself and as successor by merger to The Chesapeake and Ohio Railway Company and as successor by merger to The Baltimore and Ohio Railroad Company, The Baltimore and Ohio Chicago Terminal Railroad Company, and Fruit Growers Express Company, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 95–858T.

United States Court of Federal Claims.

April 1, 2002.

David W. Feeney, Cadwalader, Wickersham & Taft, New York City, attorney of record for plaintiffs. Stephen N. Shulman, O'Connor & Hannan, Washington, D.C., argued the cause for plaintiffs.

Benjamin C. King, Jr., with whom were Assistant Attorney General Eileen J. O'Connor and Mildred L. Seidman, Department of Justice, Tax Division, Court of Federal Claims Section, Washington, D.C., for defendant.

**OPINION**

WIESE, Judge.

This is a suit for the refund of federal employment taxes collected under the Railroad Retirement Tax Act ("RRTA"), 26 U.S.C. §§ 3201–3202 and 3231–3233 (railroad retirement taxes) and the Federal Insurance Contributions Act ("FICA"), 26 U.S.C. §§ 3121–3128 (social security taxes).[1] These taxes were imposed on amounts paid to employees pursuant to reduction-in-force pro-

grams initiated by CSX Corporation and its constituent railroads (plaintiffs in this action) beginning in 1984 and extending through 1990.[2] This action is now before the court on plaintiffs' motion for summary judgment (as to liability only) and defendant's cross-motion. On the basis of the parties' briefs and the oral argument that was heard on February 14, 2002, we conclude that employment taxes apply to all payments at issue except those identified in this opinion as incident to an employee layoff.

**FACTS**

Plaintiff CSX Corporation is the common parent of a consolidated group of railroad companies that included, during the years involved in this refund suit, CSX Transportation, Inc., the Baltimore and Ohio Chicago Terminal Railroad Company, and Fruit Growers Express Company.[3]

Between 1984 and 1990, plaintiffs implemented major reductions in work-force levels that were made necessary by declining rail traffic and intense competition from other modes of transportation. Over the course of those years, plaintiffs reduced their management-related work force by approximately 33% and their union work force by approximately 39%. Taken together, these percentage decreases in personnel represented an overall reduction of railroad-related employment from approximately 54,000 employees to slightly less than 34,000 employees.

This reduction in work force was accomplished by job layoffs, reductions in hours of work and rates of pay, and permanent separations from employment. In each instance, the affected employee became entitled to a specific payment from the employer railroad, the amount and duration of which was established either by governing regulatory rulings or by superceding collective bargaining pro-

1. Citations to the Internal Revenue Code are to the provisions of Title 26 in effect during the years at issue in this case, 1984–1990.

2. Taxes imposed by RRTA are used to finance railroad employee retirement benefits which railroad employees receive in lieu of social security benefits. These taxes are imposed on "compensation." Taxes imposed by FICA are used to

finance social security and medicare benefits and are imposed on "wages."

3. Unlike the federal income-tax regime, under RRTA and FICA, when a common parent files a single return, each component company in a consolidated group pays and remits employment taxes and files its own separate employment tax returns and claims for refund.

visions. Thus, bi-weekly or monthly payments were paid to employees who were laid off as a result of the work-force reduction. Similarly, payments were made to employees whose hours of work or rates of pay were reduced as a result of the work-force reduction. And finally, lump-sum payments or, alternatively, monthly payments extending over an agreed-upon period of time, were paid to employees who ended their employment relationship with their employer as a result of the work-force reduction.

Consistent with the requirements of FICA and RRTA,[4] plaintiffs paid the employer's share of employment tax and withheld and remitted the employee's share on those amounts. Following those payments, however, plaintiffs filed timely claims for refund on their own behalf and on behalf of various employees.[5] As the basis for their refund claims, plaintiffs argued that FICA taxes are by statute to be imposed only on "wages" as that term is defined in § 3121(a) of the Tax Code, and RRTA taxes are to be imposed only on "compensation" as set forth in § 3231(e) of the Tax Code. Because the payments in question were "supplemental unemployment compensation benefits," plaintiffs maintained, they constituted neither wages nor compensation and therefore should not have been subject to tax.

In response to plaintiffs' refund claims, the IRS conducted an administrative review, but ultimately disallowed the claims. Plaintiffs then filed suit in this court seeking a determination that the reduction-in-force payments constitute neither wages nor compensation for purposes of imposing federal employment tax. For the reasons set forth below, we must reject plaintiffs' assertions except as they relate to payments to employees made on account of a layoff.

## DISCUSSION

■ The basic issue in this case is whether the payments plaintiffs made pursuant to their reduction-in-force programs fall outside the term "wages" for purposes of FICA taxes and outside the term "compensation" for purposes of RRTA taxes. In examining this issue, we start with what is not debated: as a matter of statutory definition, the term "wages" as set forth in the FICA statute and the term "compensation" as set forth in the RRTA statute are fundamentally the same in scope and are recognized in Treasury regulations as having the same meaning. 26 C.F.R. §§ 31.3121(a)–1 and 31.3231(e)–1 (1990). Both statutes adopt as the basis for the application of their respective taxes the remuneration received by an employee in return for the performance of services rendered to an employer. Thus, § 3121(a) of the Tax Code defines "wages" for FICA purposes as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash," while § 3231(e) defines "compensation" for RRTA purposes as "any form of money remuneration paid to an individual for services rendered as an employee to one or more employers." Further, each section excludes from its definition certain employer payments including, for example, employee medical and hospitalization expenses and employee insurance and annuity costs.[6]

## I.

Recognizing that the definition of the term "wages" under the FICA statute and of the term "compensation" under the RRTA statute are essentially identical, however, does not resolve our central inquiry: whether the reduction-in-force payments at issue here fall within their scope. To answer that question,

---

4. Under both RRTA and FICA, the employment tax is composed of an "employer" tax and an "employee" tax. As the withholding agent, the employer withholds and remits the employee tax and as the employer, pays the employer tax.

5. Plaintiffs attempted to notify all present and former employees in writing of their right either to claim a refund of their employment taxes or to authorize plaintiffs to file refund claims on their behalf. The administrative refund claims that plaintiffs ultimately filed included claims by

those employees (past and present) who had given their consent to be included in the claims, and former employees who could not be located after reasonable effort.

6. Because of this essential identity between "wages" and "compensation," references to "wages" in this opinion shall also be understood to include "compensation" unless otherwise indicated.

plaintiffs ask that we not limit ourselves to those definitions, but rather that we look to the term "wages" as it is defined in the income-tax withholding statute to inform how that term should be understood in the employment-tax context. Because the definition of wages in the FICA statute is so similar to the definition of wages in the income-tax withholding statute, plaintiffs argue, it is axiomatic that their interpretations should be the same.

The income-tax withholding provisions, set forth in §§ 3401–3406 of the Tax Code, indeed contain a definition of the term "wages" that is substantially the same as the definition provided for FICA purposes in § 3121(a): "all remuneration (other than fees paid to a public official) for services performed by an employee for his employer, including the cash value of all remuneration (including benefits) paid in any medium other than cash." 26 U.S.C. § 3401(a). The section that follows, § 3402, sets forth the basic requirement calling for an employer's withholding of an income tax from wages. Subsection 3402(o), titled "Extension of withholding to certain payments other than wages," reads in part as follows:

> (1) **General rule.**—For purposes of this chapter . . .
>> (A) any supplemental unemployment compensation benefit paid to an individual . . .
> shall be treated as if it were a payment of wages by an employer to an employee for a payroll period.

26 U.S.C. § 3402(o).

It is the above-quoted text that provides the statutory underpinning of plaintiffs' position. Plaintiffs maintain that the payments in question here are supplemental unemployment compensation benefits—a term whose content we examine more closely later in this opinion—and they read the quoted text to say that such benefits do not come within the definition of wages. Plaintiffs go on to say that because supplemental unemployment compensation benefits are not wages within the meaning of the income-tax withholding provisions, then neither are they wages for FICA purposes or compensation for RRTA purposes.

In support of their position, plaintiffs refer us to the Report of the Senate Finance Committee explaining that section of the bill (§ 803g of H.R. 13270) that was later enacted as § 3402(o) of the Tax Code pursuant to the Tax Reform Act of 1969. The report explains:

> *Present law.*—Under present law, supplemental unemployment benefits are not subject to withholding because they do not constitute wages or remuneration for services.
>
> *General reasons for change.*—Supplemental unemployment compensation benefits . . . paid by employers are generally taxable income to the recipient. Consequently, the absence of withholding on these benefits may require a significant final tax payment by the taxpayer receiving them. The committee concluded that although these benefits are not wages, since they are generally taxable payments they should be subject to withholding to avoid the final tax payment problem for employees.

S.Rep. No. 91–552, at 268 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2027, 2305–06. The report concluded that "[t]he withholding requirements . . . on wages are to apply to these nonwage payments." *Id.*

In addition to the statute's text and its legislative history, plaintiffs also point out that during the years in issue, the IRS consistently treated supplemental unemployment compensation benefits as nonwage payments and therefore as payments not subject to FICA taxation. As examples, plaintiffs cite Rev. Rul. 56–249, 1956–1 C.B. 488; Rev. Rul. 58–128, 1958–1 C.B. 89; Rev. Rul. 60–330, 1960–2 C.B. 46; Rev. Rul. 77–347, 1977–2 C.B. 362; and Rev. Rul. 80–124, 1980–1 C.B. 212.

On the basis of the foregoing considerations, plaintiffs contend that the law is clear: supplemental unemployment compensation benefits are not subject to FICA taxation because such benefits do not constitute wages within the meaning of § 3121(a).

Defendant disagrees with plaintiffs' position. In defendant's view, the nonwage characterization accorded supplemental unem-

ployment compensation benefits in § 3402(*o*) does not extend to § 3121(a), and, as a result, such benefits remain within the definition of wages for the purposes of FICA. That is the case, defendant contends, because Congress has made clear that the interpretation of wages for purposes of income-tax withholding is not determinative of the interpretation of wages under FICA because the objectives of the two statutes differ significantly. Thus, the treatment of supplemental unemployment compensation benefits under FICA, defendant argues, is to be assessed without regard to their characterization as nonwages under § 3402(*o*).

Defendant concedes, as an initial matter, that the Supreme Court, in addressing this issue, concluded that the law required the term "wages" under FICA to be interpreted in a manner consistent with the term "wages" under § 3401(a) since the two definitions are essentially identical. *Rowan Cos. v. United States,* 452 U.S. 247, 101 S.Ct. 2288, 68 L.Ed.2d 814 (1981). Defendant goes on to point out, however, that the *Rowan* decision has been superseded by legislative amendment. We begin, then, as does defendant, with the Supreme Court's holding in *Rowan.*

At issue in *Rowan* was the question of whether the IRS was acting in accordance with law in treating the value of employer-provided meals and lodging as wages for the purpose of imposing FICA tax, while simultaneously failing to treat that value as wages for the purpose of income-tax withholding. Based on an examination of the statutory language and the legislative histories of FICA, FUTA (the Federal Unemployment Tax Act), and the income-tax withholding provisions, the Court concluded that Congress intended a consistent definition of the term "wages." The IRS's regulations, the Court further concluded, failed "to implement the statutory definition of 'wages' in a consistent or reasonable manner" and were therefore held to be invalid. *Id.* at 263, 101 S.Ct. 2288.

As indicated, defendant maintains that *Rowan* is no longer controlling law. In support of this point, defendant refers us to the legislative history of the Social Security Amendments of 1983, Pub.L. No. 98–21, 97 Stat. 65 (1983), and in particular to the Senate Report that accompanied S.1, the bill that was subsequently enacted into law. S.Rep. No. 98–23, at 42 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 183. That report deals, *inter alia,* with a proposed amendment to § 3121(a) of the Tax Code (since enacted into law) that added the following language:

> Nothing in the regulations prescribed for purposes of chapter 24 (relating to income tax withholding) which provides an exclusion from "wages" as used in such chapter shall be construed to require a similar exclusion from "wages" in the regulations prescribed for purposes of this chapter.

26 U.S.C. § 3121(a) (last paragraph).

In setting forth the reasons for this "decoupling" amendment, the Senate Report explains that, while the objectives of the social security program differ significantly from the objectives underlying the income-tax withholding rules, the *Rowan* decision would otherwise require that the term "wages" for each of these regimes be interpreted in the same manner in the absence of statutory provisions to the contrary. The amending language was thus intended to correct this result, *i.e.,* to permit the determination of whether amounts are includable in the social security wage base to be made without regard to whether such amounts are treated as wages for income-tax withholding purposes. The report explains:

> [T]he committee believes that amounts exempt from income tax withholding should not be exempt from FICA unless Congress provides an explicit FICA tax exclusion.
>
> . . . .
>
> The bill provides that ... the determination whether or not amounts are includible in the social security wage base is to be made without regard to whether such amounts are treated as wages for income tax withholding purposes. Accordingly, an employee's "wages" for social security tax purposes may be different from the employee's "wages" for income tax withholding purposes.

S.Rep. No. 98–23, at 42 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 183. On the basis of the quoted statute and its legislative history,

defendant contends that the content of the term "wages" as expressed in § 3402(*o*) cannot be carried over to the content of the term "wages" for FICA purposes.

Plaintiffs challenge this reading of the statute. The only effect of the legislative words, plaintiffs insist, is to authorize the IRS to exclude wage payments from income-tax withholding without also excluding them from FICA taxation. But, plaintiffs go on to say, in the absence of such an exclusion, there is no basis for distinguishing between wages for income-tax withholding purposes and wages for FICA purposes because the basic definition of each remains the same. From plaintiffs' point of view then, the only way wage amounts can be treated differently is in the presence or absence of a regulatory exclusion.

We agree with plaintiffs' position. Congress has indeed gone on record as saying that the income-tax withholding system and the FICA-tax withholding system each serves a different interest which may, in turn, dictate differences in the make-up of their respective wage bases. But, as plaintiffs correctly point out, the statute that Congress enacted to facilitate such differentiation is not self-executing—its operation depends on the promulgation of regulations that in fact establish distinctions between wages for income-tax withholding purposes and wages for FICA-tax withholding purposes. Absent such regulations, this court has no basis for distinguishing between the content of the term "wages" for income-tax withholding purposes and the content of that term for FICA-tax withholding purposes. Simply put, the holding of *Rowan* remains in place.

This same conclusion was expressed by the Federal Circuit in *Anderson v. United States*, 929 F.2d 648 (Fed.Cir.1991). In that case, the question was whether payments provided to civilian teachers employed by the Department of Defense in reimbursement of their overseas lodging costs constituted wages for FICA purposes. The court determined that the payments were specifically excluded from income and, hence, were not wages.

In reaching this conclusion, the court was required to address the government's contention that the addition of the parenthetical phrase "(including benefits)" to the statutory definition of FICA wages by the Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 531, 98 Stat. 884 (1984), made the payments in question subject to FICA taxes. The argument was rejected: "We see no basis for giving the amendment '(including benefits)' greater force in FICA than it has in connection with income taxes." 929 F.2d at 653. The court then added this important footnote:

> Indeed, in light of the Supreme Court's decision in *Rowan Cos.*, and the legislative response to *Rowan Cos.* in the [Social Security Amendments (SSA) ] of 1983, we are constrained to interpret the "(including benefits)" language added by the [Deficit Reduction Act] in the same manner in both statutes. The SSA amendment provided for treating "wages" in both statutes differently, *but only through exclusions promulgated by regulation.* See 26 U.S.C. § 3121(a) (1982 & Supp. II 1984) (last paragraph). There is no regulation pointed to which indicates that any different effect is to be attributed to "(including benefits)" as between the FICA and income tax withholding statutes. *Thus, under Rowan Cos. the identical change to these statutory sections having substantially similar language is to be interpreted as having the same force and effect in each provision.*

*Id.* at 653 n. 10 (emphasis added).

Defendant endeavors to overcome the significance of the quoted text by pointing out that it is not a holding of the case but merely dicta. But that observation does not undercut the significance of the text as a carefully thought-out expression of opinion on a matter that was of importance in that case and that is of even greater importance here. The label of "dicta" does not overcome the analytical force of the quoted text. For the reasons stated, then, we accept plaintiffs' premise that, barring differences in the exclusions to the two statutes, the fundamental definition of wages under the FICA and income-

tax withholding statutes are to be understood as being identical.[7]

## II.

Defendant argues, however, that despite our interpretation of *Rowan* and the subsequent amending legislation, the text of the FICA and income tax-withholding statutes themselves preclude a finding that a non-wage item under § 3402(*o*) necessarily constitutes a nonwage item under § 3121(a). This is the case, defendant maintains, because only two of the three items listed as nonwages in § 3402(*o*)—annuity payments and sick pay—are also excluded from the definition of wages under FICA.[8] The third non-wage item under § 3402(*o*)—the claimed supplemental unemployment compensation benefits in question here—are provided no similar exclusion under FICA.[9] From that

---

7. During oral argument, defendant's counsel referred the court to several FICA-tax cases in which the courts drew upon legislative history to bolster their conclusion regarding the intended scope of a provision that retroactively amended the effective dates of certain FICA-tax law changes, including the "decoupling provision" quoted above (the *Rowan* override provision). *See, e.g., Canisius College v. United States*, 799 F.2d 18 (2d Cir.1986), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987); *Temple Univ. v. United States*, 769 F.2d 126 (3d Cir.1985), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2914, 91 L.Ed.2d 544 (1986).

We do not think these cases are helpful to defendant's position. Without getting into specifics, it is enough to note that in the cited cases, the courts enlisted the aid of legislative history to reinforce their interpretation of the words of a statute. Here, by contrast, defendant would have us engage legislative history to stand in place of the words of a statute. Specifically, defendant would have the court draw upon the legislative history of the "decoupling provision" to establish a distinction between wages for FICA purposes and wages for income-tax purposes despite the absence of any law, expressed either in statute or regulation, creating such a distinction. The short answer to this contention is that courts are authorized to interpret the law, not rewrite the law.

8. § 3402(*o*) provides:

**Extension of withholding to certain payments other than wages.—**
(1) **General rule.—**For purposes of this chapter (and so much of subtitle F as relates to this chapter)—
(A) any supplemental unemployment compensation benefit paid to an individual,
(B) any payment of an annuity to an individual, if at the time the payment is made a request that such annuity be subject to withholding under this chapter is in effect, and
(C) any payment to an individual of sick pay which does not constitute wages (determined without regard to this subsection), if at the time the payment is made a request that such sick pay be subject to withholding under this chapter is in effect,
shall be treated as if it were a payment of wages by an employer to an employee for a payroll period.

26 U.S.C. § 3402(*o*).

9. § 3121(a) reads in part:

**Wages.—**For purposes of this chapter, the term "wages" means all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash; except that such term shall not include—
. . .
(2) the amount of any payment (including any amount paid by an employer for insurance or annuities, or into a fund, to provide for any such payment) made to, or on behalf of, an employee or any of his dependents under a plan or system established by an employer which makes provision for his employees generally (or for his employees generally and their dependents) or for a class or classes of his employees (or for a class or classes of his employees and their dependents), on account of—
(A) sickness or accident disability (but, in the case of payments made to an employee or any of his dependents, this subparagraph shall exclude from the term "wages" only payments which are received under a workmen's compensation law), or
(B) medical or hospitalization expenses in connection with sickness or accident disability, or
. . .
(4) any payment on account of sickness or accident disability, or medical or hospitalization expenses in connection with sickness or accident disability, made by an employer to, or on behalf of, an employee after the expiration of 6 calendar months following the last calendar month in which the employee worked for such employer;
(5) any payment made to, or on behalf of, an employee or his beneficiary—
. . .
(B) under or to an annuity plan which, at the time of such payment, is a plan described in section 403(a),
. . .
(D) under or to an annuity contract described in section 403(b), other than a payment for the purchase of such contract which is made by reason of a salary reduction agreement (whether evidenced by a written instrument or otherwise) . . . .

difference in statutory structure, defendant asks us to conclude that if Congress had intended supplemental unemployment compensation benefits to be exempt from FICA, it would have made them the subject of a specific exclusion as it did with annuity payments and sick pay. Absent such an exclusion, defendant maintains, supplemental unemployment compensation benefits must be subject to employment tax.

Although defendant's argument has appeal, it is not correct. The problem with the argument is that it fails to recognize that the provisions for withholding that Congress enacted in § 3402(*o*) were prompted by the income-tax liabilities associated with two fundamentally different categories of employee benefit payments. The first category involved payments that Congress recognized as constituting nonwage payments under existing law. Included here were supplemental unemployment compensation benefits ("[u]nder present law, supplemental unemployment compensation benefits are not subject to withholding because they do not constitute wages or remuneration for services," S.Rep. No. 91–552, at 268 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2027, 2305–06) and wage continuation payments (sick pay) made by third-party payors ("no tax is specifically required to be withheld upon any wage continuation payment made by a person who is not the employer," S.Rep. No. 96–1033, at 11 (1980), *reprinted in* 1980 U.S.C.C.A.N. 7218, 7227). The second category was limited to annuity payments, payments that Congress recognized as "remuneration" that "present law specifically excludes ... from the definition of wages." S.Rep. No. 91–552, at 268 (1969).[10]

As to both categories of income, the legislative concern was the same: the absence of income-tax withholding from the amount being paid confronted the recipients of these benefits with unanticipated year-end tax lia-

bilities—a financial burden that can be assumed to have been neither welcome nor easily discharged. It was the alleviation of these unfunded year-end tax liabilities that led to the enactment of the "pay-as-you-go" income-tax withholding provisions set forth in § 3402(*o*).[11]

Of chief importance here, however, are not the reasons that prompted Congress to enact § 3402(*o*), but rather the nature of the income that created the need for the legislation in the first instance: nonwage payments on the one hand and specific statutory wage exclusions on the other. It is this difference in the nature of the income addressed in § 3402(*o*) that explains why defendant is wrong in claiming that the income payments addressed in § 3402(*o*) remain subject to FICA taxation unless specifically excluded. To put it plainly, payments that are nonwage payments from the start are beyond FICA taxation as much as they are beyond income-tax withholding. The taxation of such payments requires their specific *inclusion* in the taxing scheme. The legislative treatment of third-party payments of sick pay illustrates this last point well.

As previously noted, wage continuation payments, such as sick pay paid by third-party payors, constituted remuneration that was not subject to income-tax withholding because such payments were made by a party who was not the employer. Congress, as we have explained, addressed the tax burden associated with this absence of withholding by extending income-tax withholding to "any payment to an individual of sick pay which does not constitute wages." 26 U.S.C. § 3402(*o*)(1)(C). However, no comparable provision was included in the FICA statute. Hence, such third-party payments remained outside the scope of wages for FICA purposes. Congress subsequently addressed this issue as well. In Section 3 of the Omnibus Reconciliation Act of 1981, Pub.L. No.

---

26 U.S.C. § 3121(a).

**10.** The Tax Code sections to which Congress was referring—26 U.S.C. §§ 3401(a)(12)(B) and 3121(a)(5)(B) (1964)—each excluded from wages a payment "under or to an annuity plan which, at the time of such payment, is a plan described in section 403(a)."

**11.** As originally enacted in 1969, § 3402(*o*) extended withholding only to supplemental unemployment compensation benefits and annuity payments. The extension of withholding to sick pay became part of § 3402(*o*) through an amendment to that section enacted as Section 4 of Pub.L. No. 96–601, 94 Stat. 3495, 3496–98 (1980).

97–123, 95 Stat. 1659, 1662 (1981), Congress added language designating a third-party payor of sick pay as "the employer" for purposes of FICA tax assessments. That language, which we quote below, now appears as the last sentence of 26 U.S.C. § 3121(a).[12]

To return to our starting point, we think it clear from Congress' treatment of the third-party payor issue that the absence of an exclusion from the definition of wages for FICA purposes is not determinative of whether a particular payment is subject to FICA taxation. The question that needs to be asked is whether the payment falls outside the definition of wages from the start. If answered in the affirmative, then FICA taxation depends on a specific inclusion in § 3121(a) and, absent that, FICA taxes do not apply. Since supplemental unemployment compensation benefits "do not constitute wages or remuneration for services," S.Rep. No. 91–522, at 268 (1969), *reprinted in*, 1969 U.S.C.C.A.N. 2027, 2305–06, their taxation under FICA would require their specific inclusion in § 3121(a). And because there is no specific inclusion of supplemental unemployment compensation benefits in § 3121(a), no FICA taxes apply to such payments.

### III.

To conclude that supplemental unemployment compensation benefits are not subject to taxation under FICA, however, is not to say that the payments in issue here are in fact supplemental unemployment compensation benefits as that term is used in § 3402(*o*). Section 3402(*o*)(2) defines supplemental unemployment compensation benefits as follows:

> [A]mounts which are paid to an employee, pursuant to a plan to which the employer is a party, because of an employee's involuntary separation from employment (whether or not such separation is temporary), resulting directly from a reduction

in force, the discontinuance of a plant or operation, or other similar conditions, but only to the extent such benefits are includible in the employee's gross income.

26 U.S.C. § 3402(*o*)(2). In applying the above-quoted statute to the facts of this case, we take heed of the instruction given by the Supreme Court in *Crane v. Commissioner*, 331 U.S. 1, 6, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), that "the words of statutes-including revenue acts-should be interpreted where possible in their ordinary, everyday senses." We proceed accordingly.

As noted earlier in this opinion, there are essentially three types of payments at issue: payments to laid-off employees, payments to employees on "standby" (*i.e.*, reduced hours), and payments to employees who received separation allowances in exchange for their relinquishment of employment with plaintiffs. All payments share a common characteristic: they were made in furtherance of plaintiffs' decision to reduce the size of their railroading operations and, correspondingly, the size of their employee payrolls. Accordingly, that part of § 3402(*o*)(2)'s definition that restricts supplemental unemployment compensation benefits to "amounts which are paid to an employee ... resulting directly from a reduction in force, the discontinuance of a plant or operation, or other similar conditions" is not at issue here. What is at issue, however, is whether the payments satisfy the requirement of "amounts which are paid to an employee ... because of an employee's involuntary separation from employment."

In defendant's view, none of these payments qualify as supplemental unemployment compensation benefits because none satisfies the criteria governing the recognition of such payments set forth in Rev. Rul. 56–249, 1956–1 C.B. 488. Additionally, defendant argues that the majority of the payments fail to comply with the provisions of § 3402(*o*) because the payments were made to employees who had not separated from their employment and to employees whose

---

**12.** Section 3121(a) concludes as follows:

Except as otherwise provided in regulations prescribed by the Secretary, any third party which makes a payment included in wages solely by reason of the parenthetical matter contained in subparagraph (A) of paragraph (2) shall be treated for purposes of this chapter and chapter 22 as the employer with respect to such wages.

26 U.S.C. § 3121(a) (last sentence).

separation was voluntary rather than involuntary.

In assessing the merits of these arguments, we begin with the contention that Rev. Rul. 56–249 prescribes the criteria necessary to the qualification of payments as supplemental unemployment compensation benefits under § 3402(o). The question addressed in the revenue ruling was whether benefits from an employer-funded trust created to supplement state unemployment benefits paid to employees laid off as the result of a reduction in force represented wages for purposes of the taxes imposed by FICA and FUTA, as well as for purposes of income-tax withholding. In answering this question— apparently then a question of first impression—the IRS looked to the conditions for employee eligibility established under the trust's management plan and, on the basis of these conditions, concluded that the payments, although income, were not wages. Accordingly, the IRS ruled that neither FICA nor FUTA taxes applied and that the payments were not subject to income-tax withholding. Defendant now argues that the conditions governing the trust plan considered in the revenue ruling [13] establish the baseline for the qualification of supplemental unemployment compensation benefits under § 3402(o). We cannot accept this argument.

As an initial matter, the revenue ruling offers no analysis to explain why the plan conditions it recites are sufficient to take the payments in question outside the definition of "wages." Clearly, such an explanation was called for, given, in particular, the expansive definition of the term "employment" that was announced by the Supreme Court's decision, some ten years earlier, in *Social Security Bd. v. Nierotko*, 327 U.S. 358, 365–66, 66 S.Ct. 637, 90 L.Ed. 718 (1946) (holding that the term "service" as used in the Social Security Act's definition of "employment" means not only work actually done, but also "the entire employer-employee relationship for which compensation is paid to the employee by the employer"). Absent an explanation of its result, Rev. Rul. 56–249 can have no persuasive force. It is, therefore, too ambitious an argument for defendant now to say that we should look to Rev. Rul. 56–249 as our guide in deciding whether the payments in issue here come within the terms of § 3402(o). We decline to do so. We are reinforced in this conclusion by the fact that the criteria stated in Rev. Rul. 56–249 were not incorporated into § 3402(o) even though Congress, it may justifiably be assumed, was cognizant of contemporaneous administrative rulings when, in the enactment of § 3402(o), it identified supplemental unemployment compensation benefits as not being subject to withholding "[u]nder present law." S.Rep. No. 91–552, at 228 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2027, 2305.

### A.

Turning then to defendant's more specific objections, we consider first those payments that were made to laid-off employees. As a result of the down-sizing of the railroad operations, a significant portion of plaintiffs' employees were placed into layoff status and in that status became eligible for layoff bene-

---

13. The conditions for payment eligibility under the plan considered in Rev. Rul. 56–249 were the following:

   (1) [T]he benefits are paid only to unemployed former employees of *M* Company who are on layoff from the Company; (2) eligibility for benefits depends on the meeting of prescribed conditions subsequent to the termination of the employment relationship with *M* Company; (3) benefits are paid by the trustees of independent trust funds; (4) the amount of a weekly benefit payable under the plan is based upon (a) the amount of the weekly benefit payable under the appropriate State unemployment compensation laws, (b) the amount of other remuneration allowable under such State unemployment compensation laws, and (c) the amount of straight-time weekly pay after withholding of all taxes and contributions; (5) the duration of weekly benefits payable under the plan depends upon a combination of (a) the number of accumulated credited units, and (b) the fund position; (6) a right, if any, to benefits does not accrue until a prescribed period after the termination of the employment relationship with *M* Company has elapsed; (7) the benefits ultimately paid are not attributable to the rendering of particular services by the recipient during the period of his employment; and (8) no employee has any right, title, or interest in or to any of the assets of the fund or in or to any Company contributions thereto until such time as he is qualified and eligible to receive a benefit therefrom.

   Rev. Rul. 56–249, 1956–1.C.B. 488, 492.

fits. However, employees who failed to exercise their seniority to obtain another position or who declined to transfer to an available position elsewhere in the carrier's system became ineligible for the continued receipt of benefits.

Entitlement to these benefits flowed from various employee job-protection measures imposed on rail carriers by the Interstate Commerce Commission and by collectively bargained shopcraft and clerical employee agreements. Although the benefits provided under these measures varied, in general the amount of the payment represented a fixed percentage of the employee's average monthly compensation, while the duration of the payment was governed by the worker's length of service with the railroad. In a typical situation, a laid-off employee with fifteen years of service could expect to receive a monthly benefit equal to 60% of his average monthly compensation for a period of up to 60 months.

In our view, these payments qualify as supplemental unemployment compensation benefits under § 3402(o): "amounts ... paid to an employee, pursuant to a plan to which the employee is a party, because of an employee's involuntary separation from employment ... resulting directly from a reduction in force." Defendant argues to the contrary. The term "separation," defendant points out, is generally understood to signify "[t]he action of separating or parting." XIV *The Oxford English Dictionary* 999 (2d ed.1989). Illustrative of this usage, defendant further notes, is the meaning associated with the phrase "separation from employment" in conventional speech: the "termination of a contractual relationship." *Webster's Third New International Dictionary* 2070 (1993). Here, however, there was no termination of the employment relationship—the laid-off employee remained on the carrier's payroll—and, thus, in defendant's view, no separation from employment occurred.

■ We do not agree with this argument. For purposes of income-tax withholding and FICA-tax withholding, the term "employment" is defined as the performance of "any service" by an employee for an employer. 26 U.S.C. §§ 3401(d) and 3121(b). Thus, "sepa-ration from employment" within the meaning of § 3402(o) refers to a discontinuance in the performance of service by the employee for the employer rather than, as defendant would have it, a discontinuance of the employer-employee relationship in its entirety. Since a laid-off employee is not performing any service for the employer, such employee has undergone a "separation from employment" within the meaning of § 3402(o).

■ In reaching this conclusion, we remain mindful of the Supreme Court's reading of the words "any service" in the Social Security Act's definition of employment: " 'service' ... means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer." *Nierotko,* 327 U.S. at 366, 66 S.Ct. 637. While these words are certainly expansive enough to sweep into the employment relationship any payment made by an employer on account of an employee—hence making any such payment a wage—nevertheless, § 3402(o) payments must be regarded as an exception to this broad pronouncement. In that later-enacted section, Congress specifically identified employer payments made "because of an employee's involuntary separation from employment" as nonwages, *i.e.,* as payments occurring outside the employment relationship. 26 U.S.C. § 3402(o)(2). Therefore, if § 3402(o) is to be accorded the meaning that Congress intended—as surely it must—then the "separation from employment" to which it refers must be understood to refer to an employee's separation from active engagement in the employer's business. Accordingly, in this case, the payments made to a laid-off employee qualify as supplemental unemployment compensation benefits.

### B.

■ The second category of benefit payments at issue here involves payments made to employees identified as "guaranteed extra-boards" and "reserve pools"—employees whose full-time positions were eliminated through agreements negotiated between the railroads and their operating unions. Under the terms of these agreements, the affected employees remained subject to recall on an

as-needed basis, essentially creating an emergency work force. Further, the employees in these standby categories remained on the railroad's active service payroll and were guaranteed a certain minimum compensation per pay period adjusted by amounts paid for work actually performed. (Guaranteed extraboards, the group of employees with the greater level of seniority, were compensated at a higher rate than reserve pools.)

The dispute in this category centers on the amounts paid to the extraboards and reserve pools while on standby, *i.e.*, the amounts paid as the guaranteed minimum. Plaintiffs contend that these minimum payments represented compensation intended to redress a partial loss of employment arising from a work-force reduction. Such payments, plaintiffs therefore argue, are made in consequence of an involuntary separation and are thus properly regarded as supplemental unemployment compensation benefits. In support of this position, plaintiffs refer us to several administrative source materials, including a revenue ruling, Rev. Rul. 70–189, 1970–1 C.B. 134; a general counsel memorandum, G.C.M. 34190 (Aug. 29, 1969); and private letter rulings, P.L.R. 8736030 (June 8, 1987) and P.L.R. 8506018 (Nov. 8, 1984), all of which are said to affirm the proposition that a reduction in hours is equivalent to a partial separation that in turn satisfies the involuntary separation requirement of § 3402(*o*).

We have considered the cited materials but do not find them helpful. While these sources do indeed equate a forced reduction in hours with an involuntary separation under § 3402(*o*), they offer no explanation for this result and we can think of none. As noted above (in the discussion of layoff benefits), we construe the reference in § 3402(*o*)(2) to a "separation from employment" as contemplating an employee's release from an active role in the discharge of the employer's business. That is not what we encounter here. Employees identified as guaranteed extraboards and reserve pools were carried on the company's active payroll, received a guaranteed minimum compensation for which, in turn, they were obliged to remain subject to recall on an as-needed

basis, and were compensated at the full daily rate for all days actually worked. In short, these employees may have been underemployed but they were not unemployed. Hence, there was no "separation from employment" within the meaning of § 3402(*o*)(2).

## C.

◼ The last category of payments in dispute here are separation payments. In order to accelerate the necessary reductions in work force, the railroads negotiated with the various operating unions for the right to offer employees the option of terminating their employment relationship with the company (and simultaneously relinquishing all rights and benefits) in exchange for a separation payment. With the approval of the rank and file of union membership, such offers were eventually extended to all groups of employees—those on layoff status, those on standby, and those holding full-time positions with the railroad. In every instance, the employee who elected to terminate his or her employment was required to acknowledge, in writing, that his or her resignation was a voluntary action taken in response to the carrier's offer of a severance payment.

It is this last-noted fact that brings us immediately to the core of the dispute concerning separation payments. Plaintiffs contend that despite the seemingly voluntary nature of the employee's action, a decision to terminate was, in reality, an involuntary one prompted by the on-going threat of job loss that the workers faced because of the carriers' unrelenting efforts to downsize operations. In other words, it was a matter of making the best of a bad situation: separation payments represented a better deal than the loss of a full-time job. Based on these circumstances, plaintiffs say that the acceptance of separation payments represented a forced choice—an involuntary separation in disguise—that now justifies treating those payments as supplemental unemployment compensation benefits under § 3402(*o*).

Defendant sees the facts quite differently. Defendant points out that most of plaintiffs' employees could not have been terminated without plaintiffs' incurring substantial liabil-

ities to those employees for protective payments. Against that background of assured wage support, defendant argues, it could not have been the economic threat of job loss that prompted an employee's decision to elect a separation payment, but rather the substantial attractiveness of the payment in its own right. In some cases, as for example with engine service personnel, the separation payments were as much as $75,000. In short, defendant sees an employee's acceptance of a separation payment and the resulting termination of employment as a purely voluntary action. By this reasoning then, separation payments are ineligible for treatment as supplemental unemployment compensation benefits.

We think both views have their place in this lawsuit. Certainly, the employee who elects a separation payment in lieu of layoff benefits cannot be said to have voluntarily separated from employment. In that particular situation, the employee is not electing to separate from employment—that change in status has already taken place—but is, instead, electing to resolve the uncertainty associated with a separation from employment of indefinite duration (i.e., the layoff) in favor of a permanent separation. The employee's election to permanently relinquish his or her status as an employee after having been involuntarily separated from employment in the first instance does not alter the character of the initial separation: it remains involuntary. As a result, the decision to accept such separation payments does not make the payments ineligible for treatment as supplemental unemployment compensation benefits under § 3402(o).

As to the other separation payments in issue here, however, a different outcome is required. Specifically, employees who elect separation in lieu of remaining in their existing positions (including those employees who elect separation in lieu of standby), cannot be described as having been involuntarily separated. For these employees, the decision to terminate the employment relationship is their own, not their employer's. And this remains true even if it was not the attractiveness of the separation payment that persuaded the employee to act but rather the possibility of a layoff or the dislocation of a forced transfer that prompted the termination decision. Though avoidance of economic uncertainty may indeed force such a decision, where the decision itself originates with the employee, the separation must be regarded as voluntary. In these situations, then, the separation payments do not qualify as supplemental unemployment compensation benefits.

Plaintiffs insist, however, that even if the court holds that the separation payments do not qualify as supplemental unemployment compensation benefits, these payments nevertheless remain beyond the reach of employment taxes because they do not, in plaintiffs' view, represent compensation for services and, hence, do not constitute wages. In support of this position, plaintiffs point to a number of factors which, they say, demonstrate the noncompensatory nature of the separation payments. Separation payments were not calculated, for example, with reference to factors traditionally used to determine employee compensation—such as length of service or rate of pay—but instead were negotiated craft by craft without regard to individual employment differences. All active trainmen, for instance, could elect to separate for a payment of $50,000 regardless of position (brakeman or conductor). Moreover, unlike standard compensation arrangements, the separation agreements were not negotiated at the outset of the employment relationship to establish the terms of service and payment but were instead negotiated in the course of a work-force reduction in order to eliminate positions. Thus, the separation payments had their origin in the cessation of employment rather than in its continuance. Finally, plaintiffs make the point that the separation payments were essentially "buy-out" payments, i.e., amounts paid to separating employees in exchange for their release of contract employment rights. According to plaintiffs, then, the notion of payment for service which underlies the concept of wages is simply not present in the case of the separation payments at issue here.

We think plaintiffs are applying the definition of wages too narrowly. As has been

repeated several times in this opinion, the term "wages" is defined as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." 26 U.S.C. § 3121(a). Pursuant to this definition then, the value of the benefits and protections that each employee held in his or her position—rights to vacation pay, sick pay, layoff pay, and seniority—constituted part of the employee's total compensation package and, hence, constituted wages. Therefore, when these job-related benefits are relinquished in favor of a lump-sum payment, the transaction simply amounts to a redemption, paid in cash, of wage amounts previously paid in kind. Because a separation payment is simply an exchange of equivalent values, what were wages at the start remain wages at the end.

Plaintiffs insist, however, that payments received in exchange for the release of employment rights are not wages subject to employment taxes. In support of this position, plaintiffs rely on *North Dakota State Univ. v. United States,* 255 F.3d 599 (8th Cir.2001), a case holding that severance payments made to tenured faculty members in exchange for their early retirement did not constitute remuneration for services and, hence, did not constitute wages. The basis for this holding was the court's conclusion that the relinquishment of tenure represented the relinquishment of rights to "continued employment absent fiscal constraints or adequate cause for termination." *Id.* at 607. Plaintiffs now draw on this same reasoning, saying that the job protection and seniority rights relinquished here are, like tenure, rights to continued employment. Hence, they argue, the separation payments received in exchange for the relinquishment of these rights are not wages.

Although this court is not bound by a decision of the Eighth Circuit, it recognizes that, as a trial court, it should endeavor to follow the teaching of higher authority whenever it can reasonably do so. In this instance, however, such adherence is not possible—at least not without reversing course on what we have thus far decided. This court can see no basis upon which to distinguish

between the tenure rights considered in *North Dakota* and the contract rights at issue here. In each case, the surrender of these rights in return for a cash payment represents the surrender of enforceable rights to future earnings in return for a present sum. Because the rights being surrendered are integral to the employment relationship—they are part and parcel of the job protections and job benefits to which the employee may lay claim in return for his or her labor—they must be considered wages. And whether accrued over the term of the employment relationship or redeemed at present value, these rights represent remuneration for services and, hence, are wages.

### CONCLUSION

For the reasons stated above, we grant in part and deny in part both plaintiffs' motion for partial summary judgment and defendant's cross-motion for summary judgment.

