CSX CORPORATION, INC., CSX Transportation, Inc., for itself and as successor by merger to The Chesapeake and Ohio Railway Company and as successor by merger to The Baltimore and Ohio Railroad Company, The Baltimore and Ohio Chicago Terminal Railroad Company, and Fruit Growers Express Company, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 95–858T.

United States Court of Federal Claims.

Oct. 31, 2003.

---

David W. Feeney, Cadwalader, Wickersham & Taft, New York City, attorney of record for plaintiffs. Stephen N. Shulman, O'Connor & Hannan, Washington, D.C., argued for plaintiffs.

Benjamin C. King, Jr., with whom were Assistant Attorney General Eileen J. O'Connor and Mildred L. Seidman, Department of Justice, Tax Division, Court of Federal Claims Section, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

This tax refund suit is before the court after oral argument on the parties' cross-motions for summary judgment. At issue is whether plaintiffs are entitled to a refund of federal employment taxes collected under the Railroad Retirement Tax Act ("RRTA"), I.R.C. §§ 3201–3202, 3231–3233 (2000),[1] for the 1987 tax year. Specifically, plaintiffs seek the enforcement of a private letter ruling granting retroactive relief from such taxes that the Internal Revenue Service ("IRS") had initially issued in their favor but thereafter reconsidered and revoked. Plaintiffs contend that the revocation was unwarranted in law and without justification in fact. For the reasons set forth below, plaintiffs' motion for summary judgment is denied and defendant's cross-motion is granted.

## FACTS

Plaintiffs CSX Corporation and CSX Transportation, Inc. are the common parent and principal railroad subsidiary, respectively, of a consolidated group of transportation and transportation business companies. CSX Transportation operates the largest rail network in the eastern United States.

In June 1987, plaintiffs introduced a "Severance Pay Plan" for full-time, salaried, non-union management employees (the "CSX plan") as part of an overall workforce reduction program. The CSX plan offered payments to eligible employees who agreed to separate from the company and to waive seniority rights and all employment– and separation-related rights and claims.

Employees who elected to participate in the CSX plan were presented with three payment options. The first option entitled employees to a lump-sum payment equivalent to either one year's salary or six months' salary, depending on the employee's length of service. The second option consisted of monthly payments combined with the continuance of most employee benefits for either one year or six months, also depending on the employee's length of service. The final option, available only to employees with five or more years of service, entitled the employee to enhanced pension benefits under a preexisting early retirement window (five additional years of service and five additional years of age for purposes of computing benefits and time of vesting). The CSX plan

1. The Internal Revenue Code comprises Title 26 of the United States Code.

initially required employees to elect separation by August 15, 1987, but the deadline was subsequently extended to December 31, 1987.

On December 15, 1987, two weeks before the election deadline, plaintiffs requested an IRS letter ruling declaring that payments made under the CSX plan constituted supplemental unemployment compensation benefits ("SUB pay") under I.R.C. § 3402(o) and were exempt from employment taxes imposed by the Federal Insurance Contributions Act ("FICA"), I.R.C. §§ 3121–3128 (2000), the Federal Unemployment Tax Act ("FUTA"), I.R.C. §§ 3301–3311 (2000), and the RRTA.[2] Rather than responding to plaintiffs' request directly, the IRS announced in a January 1989 revenue procedure that the question of "[w]hether payments made to former employees in the event of a plant closing, layoff, or reduction in force are wages for purposes of [FICA] and [FUTA]" had been placed under extensive study, and that private letter rulings on the subject would not be issued until the study had been completed and the results published in the form of a revenue ruling. Rev. Proc. 89–7, 1989–1 C.B. 778, 1989 WL 519039. The IRS notified plaintiffs in a March 1989 follow-up letter that the study would be expanded to address the question of whether similar payments made to former railroad employees were excluded from the definition of compensation for purposes of the RRTA.

The IRS published its guidance on September 4, 1990. In Revenue Ruling 90–72, 1990–2 C.B. 211, 1990 WL 675385, the IRS determined that in order for severance plan payments to qualify as SUB pay exempt from employment taxes imposed by FICA, FUTA, and the RRTA, the payments, among other conditions, had to be linked to the receipt of state unemployment compensation.[3] In imposing such a requirement, the IRS departed from the policy set forth in an earlier revenue ruling, Revenue Ruling 77–347, which had declared the connection between SUB pay and eligibility for state unemployment compensation "not a material or controlling factor" in the determination of unemployment tax exemption. Rev. Rul. 77–347, 1977–2 C.B. 362, 363, 1977 WL 44421. That partial overruling of Revenue Ruling 77–347, the IRS explained, "restores the distinction between SUB pay and dismissal pay by re-establishing the link between SUB pay and state unemployment compensation." Rev. Rul. 90–72, 1990–2 C.B. at 212.[4]

In accordance with the authority granted under section 7805(b) of the Tax Code, the IRS further declared that Revenue Ruling 90–72 would be implemented prospectively, applying only to "benefits paid on or after January 1, 1991." Id. at 213.[5]

On September 20, 1990, plaintiffs were issued Private Letter Ruling 9050061, 1990 WL 701264 (the "CSX Letter Ruling"), applying Revenue Ruling 90–72 to the CSX plan. In this ruling, the IRS observed that because benefits paid under the CSX plan were not linked to the receipt of state unem-

2. Section 3402(o) identifies SUB pay as those "amounts which are paid to an employee, pursuant to a plan to which the employer is a party, because of an employee's involuntary separation from employment (whether or not such separation is temporary), resulting directly from a reduction in force, the *discontinuance of a plant or operation,* or other similar conditions, but only to the extent such benefits are includible in the employee's gross income." I.R.C. § 3402(o)(2)(A) (2000).

3. The revenue ruling additionally specified that payments that were to be tax exempt could not be paid in a single lump sum.

4. The term "dismissal pay" is not otherwise defined in the revenue ruling. Presumably, however, the term describes employer payments that, though made on account of an employee's involuntary separation from employment, are not conditioned upon the employee's eligibility to re-

ceive benefits under the Railroad Unemployment Insurance Act, 45 U.S.C. §§ 351–358 (2000). Such payments are considered compensation and, *as such,* remain subject to the employment taxes imposed by the RRTA. *See* 20 C.F.R. § 323.6 (1992) (identifying as "not compensation" benefits payable under a qualifying SUB plan) and 20 C.F.R. § 323.3(c) (1992) (identifying a qualifying SUB plan as a plan with benefits conditioned upon, *inter alia,* employees meeting eligibility requirements under the Railroad Unemployment Insurance Act).

5. During the years at issue, section 7805(b) provided: "The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect." I.R.C. § 7805(b) (1994).

ployment compensation and because employees had the option of receiving a lump-sum payment, "the benefits paid to the employees constitute wages for FICA and FUTA purposes, and compensation for RRTA purposes" under the analysis of Revenue Ruling 90–72. The private letter ruling went on to say, however, that "under the authority of section 7805(b) of the Code, with respect to non-union employees, Rev. Rul. 90–72 only applies to benefits paid on or after January 1, 1991. Thus, benefits paid to non-union employees ... prior to such time do not constitute wages for FICA and FUTA purposes, or compensation for RRTA purposes."

On the basis of this private letter ruling, plaintiffs filed a claim for refund on December 27, 1990, seeking a return of the $181,352.80 in employer taxes and the $109,118.50 in employee taxes paid under the RRTA for the 1987 tax year.[6] No refund, however, was issued.

In February 1991, the IRS's Railroad Industry Specialist asked the IRS's National Office to reconsider the CSX Letter Ruling and revoke its grant of retroactive tax relief. The IRS opted not to revoke its ruling, however, and concluded in a November 8, 1991, letter to plaintiffs that while its original characterization of the CSX plan as SUB pay exempt from the taxes imposed by the RRTA may not have been correct, the IRS intended to stand by the result of the CSX Letter Ruling. Specifically, James J. McGovern, the Acting Associate Chief Counsel (Employee Benefits and Exempt Organizations) advised: "After reconsideration, the [IRS] has decided not to retroactively revoke [the CSX Letter Ruling]. Simply stated, this is a decision to honor the integrity of the letter ruling process under which the limited section 7805(b) relief was granted." Mr. McGovern cautioned, however, that "[t]his decision can not be viewed as an opinion that the underlying payments were excludable from RRTA as

SUB-pay" and noted that the CSX Letter Ruling was "limited to the program specifically mentioned in the ruling request, i.e. the approximately 800 nonunion employees who voluntarily elected to separate from service in 1987."

The McGovern letter was not, however, the end of the matter. In October 1992, the IRS District Director with audit jurisdiction over plaintiffs' claim for refund also requested revocation of the tax relief granted by the CSX Letter Ruling. The District Director claimed that plaintiffs' ruling request had omitted a material fact: that employees who elected to participate in the CSX plan would be disqualified from receiving the federal railroad unemployment benefits provided by the Railroad Unemployment Insurance Act, 45 U.S.C. §§ 351–368 (2000).[7] The National Office treated the District Director's request as one for technical advice and allowed plaintiffs to present their arguments against revocation at conferences held on January 6, 1993, and June 17, 1993.

On December 21, 1993, approximately six years after plaintiffs' initial request for a letter ruling, the IRS issued a Technical Advice Memorandum revoking the CSX Letter Ruling. In explaining its decision, the IRS took the position that plaintiffs had omitted a material fact, sufficient to justify revocation, by failing to disclose to the IRS that receipt of payments under the CSX plan precluded former employees from receiving railroad unemployment benefits. The IRS concluded:

> [T]he fact that the Taxpayer's benefit recipients were disqualified from receiving government unemployment benefits would have been material to the SUB-pay determination because it would cause the plan benefits to be taxed as dismissal payments and prevent the plan's qualification as a SUB-pay plan for purposes of the adminis-

---

6. Under both the RRTA and FICA, the employment tax is composed of an "employer" tax and an "employee" tax. As the withholding agent, the employer withholds and remits the employee tax, and as the employer, pays the employer tax.

7. Under the provisions of the Railroad Unemployment Insurance Act, receipt of a separation allowance (*i.e.,* payment pursuant to a voluntary

separation) disqualifies an otherwise eligible railroad employee from receiving unemployment benefits for a specified period equal to the length of time it would have taken the employee to earn compensation in the amount of the separation allowance. 45 U.S.C. § 354(a–1)(iii) (2000); *see also* 20 C.F.R. § 322.7(b) (2003).

trative FICA, FUTA, and RRTA exclusion. The failure to disclose this fact, even if inadvertent, was an omission of material fact and dictates that the prior letter ruling should be revoked.

Based on the foregoing, plaintiffs' claim for refund was denied. Plaintiffs now seek their refund in this court.

## DISCUSSION

■ Section 7805(a) of the Tax Code authorizes the IRS to issue "all needful rules and regulations for the enforcement of [the Tax Code]." I.R.C. § 7805(a). Section 7805(b), in turn, grants the IRS discretion to limit the retroactive effect of a ruling. It is well established that, taken together, these two statutes authorize the IRS to revoke or modify a ruling retroactively to correct a mistake of law, even if a taxpayer has relied on the erroneous interpretation to its detriment. *Dickman v. Comm'r*, 465 U.S. 330, 343, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984); *Dixon v. United States*, 381 U.S. 68, 72–73, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965); *Automobile Club of Mich. v. Comm'r*, 353 U.S. 180, 183–84, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957). This principle recognizes the fact that Congress, and not the IRS, has the power to prescribe the tax laws, and a ruling that reflects a mistake of law, and thus "creates a rule out of harmony with the statute, is a mere nullity." *Dixon*, 381 U.S. at 73–74, 85 S.Ct. 1301 (quoting *Manhattan Gen. Equip. Co. v. Comm'r*, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936)). The IRS's decision not to limit the retroactive effect of a ruling may be reviewed by this court only for an abuse of discretion. *Automobile Club of Mich.*, 353 U.S. at 184, 77 S.Ct. 707; *Mulholland v. United States*, 16 Cl.Ct. 252, 262 (1989).

In contemplating the IRS's authority to revoke the CSX Letter Ruling, we are asked to consider two basic issues: first, whether the favorable tax treatment accorded plaintiffs in the CSX Letter Ruling was correct as a matter of law; and second, whether the IRS's decision to revoke that favorable treat-

ment lacked a rational basis and was thus an unlawful exercise of administrative authority. In defendant's view, the first issue is dispositive: if plaintiffs cannot demonstrate that they have in fact overpaid their taxes, they have failed to satisfy the most fundamental requirement of a tax refund suit. And in order to prove that they have overpaid their taxes, defendant maintains, plaintiffs must convince the court that the tax treatment afforded by the CSX Letter Ruling was correct as a matter of law. This, in defendant's estimation, plaintiffs cannot do.

Plaintiffs, in contrast, do not focus on the correctness of the CSX Letter Ruling but rather on the legitimacy of its revocation. Plaintiffs point out, and defendant concedes, that the stated basis for revocation was erroneous.[8] Plaintiffs therefore contend that the revocation impermissibly exposed them to a tax liability that other taxpayers—those whose severance plan payments remained within the protective scope of Revenue Ruling 90–72's "prospective only" application— were not required to bear. Such a distinction between similarly situated taxpayers, assert plaintiffs, is the hallmark of arbitrary action and is prohibited by law.

■ As to the law, both parties are correct: we must, as defendant maintains, be satisfied that plaintiffs have actually overpaid their taxes before awarding any recovery, *Lewis v. Reynolds*, 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1932) ("the ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax"); and we must equally be sure, as plaintiffs assert, that similarly situated taxpayers have been treated alike, *United States v. Kaiser*, 363 U.S. 299, 308, 80 S.Ct. 1204, 4 L.Ed.2d 1233 (1960) (Frankfurter, J., concurring) ("The Commissioner cannot tax one and not tax another without some rational basis for the difference."). Plaintiffs' case, however, falls in the application of these legal principles.

---

8. The rationale given for the revocation was CSX's omission of the fact that its plan recipients were ineligible for benefits under the Railroad Unemployment Insurance Act. Defendant's counsel admitted at oral argument, however, that there had been no material omission of fact since the IRS "could have learned of the facts that they claim were omitted."

Beginning with plaintiffs' abuse of discretion charge, we are unable to conclude that plaintiffs can legitimately claim to be on equal footing with other taxpayers who are entitled to invoke Revenue Ruling 90–72 to avoid employment tax liabilities. The question addressed in Revenue Ruling 90–72 was whether severance plan payments that met the statutory definition of SUB pay were exempt from employment taxes as being neither wages nor compensation. The IRS answered this question by saying that compliance with statutory SUB pay requirements was not in itself sufficient to establish the non-wage character of severance payments. Rather, the IRS explained that for FICA, FUTA, and RRTA purposes, the non-wage/non-compensation classification of SUB pay "is defined solely through administrative pronouncements published by the [IRS]." 1990–2 C.B. at 211–12. The IRS went on to reassert as the basis for unemployment tax exemption some of the same criteria adopted in its original ruling addressing the subject, Revenue Ruling 56–249, 1956–1 C.B. 488, 1956 WL 11286. In particular, the IRS returned to the requirement that payments otherwise meeting the definition of SUB pay had to be linked to the receipt of government unemployment compensation to qualify for exemption from employment taxes and could not therefore be receivable in a lump-sum amount. This ruling, as noted above, was given prospective application only. In other words, to qualify for non-wage treatment, payments to employees involuntarily separated made prior to the date of the ruling would not be subject to the renewed requirements if they otherwise met the requirements for SUB pay.

 Contrary to plaintiffs' assertions, Revenue Ruling 90–72 does not apply here. As we ruled in *CSX Corp. v. United States,* 52 Fed.Cl. 208, 220 (2002), payments under the CSX plan were voluntary separation payments and as such did not qualify as SUB pay ("amounts ... paid ... because of an employee's *involuntary* separation from employment," I.R.C. § 3402(*o*)(2)(A) (emphasis added)). To the extent Revenue Ruling 90–72's safe harbor extended to plans satisfying the statutory requirements for SUB pay, the CSX plan does not fall under its auspices.

We cannot therefore conclude that the IRS's decision to revoke the CSX Letter Ruling deprived plaintiffs of any benefit to which similarly situated taxpayers were entitled.

Nor does the fact that the CSX Letter Ruling originally exempted the CSX plan from employment taxes by reference to Revenue Ruling 90–72 change that result. Although plaintiffs asserted in their original request for a letter ruling that the payments were involuntary, that issue was not addressed in the CSX Letter Ruling. Plaintiffs, of course, contend that the ultimate determination—that the CSX plan payments were exempt from employment taxes—necessarily implies that the plan met the statutory definition of SUB pay and that the IRS, in so concluding, had deemed the payments involuntary. The CSX Letter Ruling, however, offers no explanation of how payments initiated at the behest of an employee may nevertheless be regarded as payments made pursuant to an involuntary separation.

Ultimately, then, we return to defendant's central point: that the failure to explain a result so seemingly inconsistent with statutory requirements renders the CSX Letter Ruling wrong as a matter of law. To defendant, the ruling in CSX's favor was plainly wrong because it treated as SUB pay payments that were actually made pursuant to a plan of voluntary separation. The IRS shared this sentiment when it was first asked to reconsider the CSX Letter Ruling, noting that the decision not to revoke the letter in order to maintain "the integrity of the letter ruling process" cannot be "viewed as an opinion that the underlying payments were excludable from RRTA as SUB-pay."

In light of these facts, we cannot endorse the contention that the revocation of the CSX Letter Ruling deprived plaintiffs of a benefit accorded other taxpayers under existing law. Rather, it would be more accurate to say that the revocation of the CSX Letter Ruling withdrew from plaintiffs a benefit not available to other taxpayers under existing law: the right to treat as SUB pay payments made to employees who had volunteered for separation from employment.

Plaintiffs, in short, have no cause to complain. They did not rely on the CSX Letter Ruling in the first instance and its revocation did not deprive them of a beneficial tax ruling enjoyed by other taxpayers. The fact that the ruling was revoked for admittedly incorrect reasons adds nothing to the case, for it left plaintiffs in no worse position than if the ruling had not been incorrectly issued in the first place.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted.