# United States Court of Appeals for the Federal Circuit

2007-5003, -5007


CSX CORPORATION, CSX TRANSPORTATION, INC.,
for itself and as successor by merger to The Chesapeake and Ohio Railway Company and
as successor by merger to The Baltimore and Ohio Railroad Company,
THE BALTIMORE AND OHIO CHICAGO TERMINAL RAILROAD COMPANY,
and FRUIT GROWERS EXPRESS COMPANY,

Plaintiffs-Appellants,

v.


UNITED STATES,

Defendant-Cross Appellant.



Stephen N. Shulman, Ivins, Phillips & Barker Chartered, of Washington, DC, argued for plantiffs-appellants. With him on the brief were David W. Feeney and Burton Spivak, Cadwalader, Wickersham & Taft LLP, of New York, New York.

Kenneth L. Greene, Attorney, Appellate Section, Tax Division, United States Department of Justice, of Washington, DC, argued for defendant-cross appellant. With him on the brief were Richard T. Morrison, Acting Assistant Attorney General, Gilbert S. Rothenberg, Acting Deputy Assistant Attorney General, and Steven W. Parks, Attorney.

Appealed from: United States Court of Federal Claims

Senior Judge John P. Wiese

# United States Court of Appeals for the Federal Circuit

2007-5003,-5007

CSX CORPORATION, CSX TRANSPORTATION, INC.,
for itself and as successor by merger to The Chesapeake and Ohio Railway Company
and as successor by merger to The Baltimore and Ohio Railroad Company,
THE BALTIMORE AND OHIO CHICAGO TERMINAL RAILROAD COMPANY,
and FRUIT GROWERS EXPRESS COMPANY,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Cross Appellant.

Appeal from the United States Court of Federal Claims in 95-CV-858,
Senior Judge John P. Wiese.

_____

DECIDED:  March 6, 2008
_____

Before BRYSON, <u>Circuit Judge</u>, PLAGER, <u>Senior Circuit Judge</u>, and MOORE, <u>Circuit Judge.</u>

BRYSON, <u>Circuit Judge</u>.

This federal tax case calls on us to decide whether payments made to employees by the appellants, an affiliated group of railroad companies that we refer to collectively as CSX, are subject to taxation under the Federal Insurance Contributions Act ("FICA"), 26 U.S.C. §§ 3101-3128, and the Railroad Retirement Tax Act ("RRTA"), <u>id.</u> §§ 3201-3241.  The Court of Federal Claims, in a series of three comprehensive

opinions, held that certain of the payments at issue were subject to tax and others were not. See 52 Fed. Cl. 208 (2002); 58 Fed. Cl. 341 (2003); 71 Fed. Cl. 630 (2006). We conclude that all the payments at issue were subject to tax, and we therefore affirm in part, reverse in part, and remand for further proceedings.

I

During the 1980s, CSX experienced financial difficulties of the kind that were felt widely throughout the railroad industry. CSX sought to deal with those difficulties in part by reducing the number of its employees. To do so, the company set up a variety of programs, either unilaterally or through agreement with its employee unions. Those programs featured financial arrangements that encouraged employees to separate from the company, while cushioning the effect on employees of the company's reduction in the size of its workforce. The dispute in this case is over the tax consequences of those arrangements for CSX and for the affected employees.

In broad summary, CSX's position is that its payments to employees who were separated from employment or who experienced reduced hours because of the reduction in the company's workforce were not taxable under FICA or the RRTA because they were not "wages" for purposes of FICA, or "compensation" for purposes of the RRTA. See 26 U.S.C. §§ 3121(a), 3231(e). The government's position is that all of the payments to employees and former employees under the plans in question were "wages" or "compensation" within the meaning of FICA and the RRTA. The trial court held that some of the payments in question constituted wages or compensation, while others did not. Both sides have appealed the court's judgment to this court. Both sides agree that the term "wages" in FICA and "compensation" in the RRTA have the same

meaning for purposes of the issues in this case. See Treas. Reg. § 31.3231(e)-1(a)(1) ("The term compensation [for purposes of the RRTA] has the same meaning as the term wages in [FICA]."). For that reason, they have focused on the portion of the dispute relating to FICA. The trial court did the same, and so will we.

The dispute in this case turns, to a significant degree, on the definition and tax treatment of a type of employee benefit referred to as supplemental unemployment compensation benefits ("SUB"). SUB benefits were first created in the 1950s as a means for employers to supplement the state unemployment compensation benefits received by their employees who lost their jobs as a result of workforce reductions. Section 3402 of the income tax withholding statutes contains a subsection, 26 U.S.C. § 3402(o), that addresses the application of income tax withholding rules as applied to SUB payments, among other types of benefits. That subsection defines SUB payments as follows:

> For purposes of [chapter 24 of the Internal Revenue Code, which deals with income tax withholding], the term "supplemental unemployment compensation benefits" means amounts which are paid to an employee, pursuant to a plan to which the employer is a party, because of an employee's involuntary separation from employment (whether or not such separation is temporary), resulting directly from a reduction in force, the discontinuance of a plant or operation, or other similar conditions, but only to the extent such benefits are includible in the employee's gross income.

Id. § 3402(o)(2)(A). The same subsection then provides that a SUB payment "shall be treated as if it were a payment of wages by an employer to an employee for a payroll period," and as such is subject to withholding for income tax purposes.

An important question in this case, which we address in detail below, is whether the statement in section 3402(o) that a SUB payment "shall be treated as if it were a payment of wages" for income tax withholding purposes necessarily implies that SUB

payments are <u>not</u> wages for either income tax or FICA purposes. The trial court answered that question in the affirmative. The court inferred from the language and legislative history of section 3402(o) that Congress regarded SUB payments, as defined in section 3402(o), as non-wages. Applying the general rule that the term "wages" has the same meaning for FICA as for the income tax laws, the court further concluded that the FICA tax obligations that are imposed on payments that constitute "wages" are not imposed on payments that fall within the definition of SUB under section 3402(o). 52 Fed. Cl. at 210-16.

Although the trial court agreed with CSX that SUB payments are not "wages" for purposes of FICA, the court nonetheless rejected CSX's position that all of the disputed payments fell within the definition of SUB payments in section 3402. Instead, the court analyzed each of the payments in dispute and held that some fell within that definition, and thus were not "wages" for employment taxation purposes, and that others fell outside that definition and constituted taxable "wages." 52 Fed. Cl. at 216-21.

The first category of payments addressed by the court were those to CSX employees who were placed into layoff status during CSX's downsizing and were eligible for layoff benefits during the period they were in that status. The amount of the layoff benefit paid to each laid-off employee represented a percentage of the employee's average monthly compensation, and the duration of the period for which the layoff benefit payments were made depended on each employee's length of service. Employees who were not willing to exercise their seniority rights to transfer to other available positions within the plaintiffs' system became ineligible for the continued receipt of those benefits. The lay-off benefit payments, according to the trial court,

constituted SUB payments within the meaning of section 3402(o) and therefore were not taxable as "wages" under FICA. 52 Fed. Cl. at 217-18.

A second category of benefit payments addressed by the trial court were those made to employees in groups referred to as "guaranteed extraboards" and "reserve pools." Those were employees whose full-time positions were eliminated but who remained subject to recall on an as-needed basis. Those employees remained on the employer's active service payroll and were guaranteed a certain minimum compensation per pay period, adjusted by the amounts they were paid for work actually performed. The court held that those payments were not SUB payments within the meaning of section 3402(o), because those employees were not separated from employment with the employer. As the trial court explained, "they may have been underemployed, but they were not unemployed." 52 Fed. Cl. at 219.

A third category of payments were those offered to non-managerial employees in exchange for agreeing to terminate their employment. In the case of employees who elected to receive a separation payment in lieu of layoff benefits, the trial court held that the separation payments were SUB payments because for those employees the separation from employment had already taken place when they were laid off. The court explained that those employees were not electing to separate from employment, but were simply electing "to resolve the uncertainty associated with a separation from employment of indefinite duration (i.e., the layoff) in favor of a permanent separation." 52 Fed. Cl. at 220. By contrast, the court held that separation payments made to employees who accepted those payments in lieu of remaining in their existing positions were not SUB payments, because the decision to terminate their employment was

theirs, not the employer's, and thus the separation was not "involuntary," as is required by section 3402(o). Those payments constituted wages, the court held, because when the employees relinquished their job-related benefits in favor of a lump-sum payment, the transaction simply amounted to "a redemption, paid in cash, of wage amounts previously paid in kind." 52 Fed. Cl. at 221.

In a separate opinion, the trial court addressed the payments that were made to managerial employees who were terminated in a two-phase process. 58 Fed. Cl. 341. In the first phase, the employees were allowed to elect to separate from employment in return for severance payments. In the second phase, the terminations were involuntary, but they were accompanied by severance payments. The trial court held that the payments made to managerial employees who separated as part of the first phase were not SUB payments, because the payments were made in connection with the employees' voluntary decisions to terminate their employment. 58 Fed. Cl. at 346. However, the court held that the payments made to employees who were involuntarily separated in the second phase were SUB payments because they were made in connection with involuntary terminations. Accordingly, the court held that the latter payments were not wages and were not subject to FICA tax.

The trial court also addressed and rejected CSX's argument that when the IRS revoked a private letter ruling regarding the separation allowances paid to certain of CSX's management employees, the agency improperly made the revocation retroactive to payments that had already been made to those employees. The court held that the retroactive revocation was lawful because it correctly denied CSX a benefit that it was not entitled to under the law. The court noted that CSX did not rely on the letter ruling,

which was issued long after CSX paid the taxes on the separation payments. Therefore, the court concluded, revocation of the ruling left CSX in no worse position than if the ruling had not been issued in the first place.

Based on the foregoing rulings, the trial court entered judgment for the plaintiffs on some, but not all, of their claims. Both sides have appealed.

II

A

FICA imposes a tax on "wages" that is used to fund both social security and medicare benefits. The tax is paid by both the employee and the employer. 26 U.S.C. §§ 3101, 3102, 3111. Section 3121 of the Internal Revenue Code defines "wages" for purposes of FICA to mean (with exceptions not pertinent here) "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." 26 U.S.C. § 3121(a). The statute defines "employment" in pertinent part to mean "any service, of whatever nature, performed . . . by an employee for the person employing him." Id. § 3121(b). The Supreme Court has recognized that those definitions are broad and that the term "service" means "not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer." Soc. Sec. Bd. v. Nierotko, 327 U.S. 358, 365-66 (1946).

Following Nierotko, this court has stated that the definition of wages in section 3121 of FICA encompasses "a broad range of employer-furnished remuneration in order to accomplish the remedial purpose of the Social Security Act." Associated Elec. Coop., Inc. v. United States, 226 F.3d 1322, 1326 (Fed. Cir. 2000); see also Abrahamsen v.

<u>United States</u>, 228 F.3d 1360, 1364 (Fed. Cir. 2000); <u>Gerbec v. United States</u>, 164 F.3d 1015, 1025 (6th Cir. 1999); <u>Mayberry v. United States</u>, 151 F.3d 855, 860 (8th Cir. 1998); <u>Hemelt v. United States</u>, 122 F.3d 204, 209 (4th Cir. 1997). The term "wages" encompasses more than the amount paid for particular services rendered; as long as the payment in question is remuneration for the overall employment relationship, it is properly encompassed within the term "wages" under section 3121(a) of FICA. See <u>Abrahamsen</u>, 228 F.3d at 1364 (remuneration for employment includes compensation "not only for work actually performed, but also the entire employer-employee relationship for which compensation is paid to the employee by the employer"); <u>Associated Elec.</u>, 226 F.3d at 1327 (same); <u>Mayberry</u>, 151 F.3d at 860 (same). Citing these and other authorities, the government contends that all of the various payments in dispute in this lawsuit qualify as "wages" under the broad definition of wages in FICA.

B

Although the government argues that the definition of wages covers each of the payments at issue in this case, it acknowledges that not all payments made to employees who are involuntarily terminated from their employment constitute "wages" for purposes of FICA. In particular, the government concedes that the term "wages" does not encompass payments of the type addressed in a 1990 IRS revenue ruling, Rev. Rul. 90-72, 1990-2 C.B. 211. That revenue ruling stated that payments by an employer to an employee do not constitute wages under FICA if they satisfy the following requirements: (1) the payments are made following the involuntary separation of the employee from the employer's workforce, (2) the payments are designed to supplement state unemployment benefits, (3) the payments are not made in a lump sum

but rather periodically for the duration of the former employee's unemployment, (4) the level of benefits depends on the employee's seniority and is not attributable to the rendering of any particular services, and (5) no employee has any interest in the fund from which the benefits are paid until the employee is eligible to receive benefits from that fund. However, except for payments that satisfy those criteria and similar criteria set forth in an earlier revenue ruling, Rev. Rul. 56-249, 1956-1 C.B. 488, the government contends that payments to current and former employees made in the context of the employment relationship, including all the payments at issue in this case, constitute "wages" within the meaning of section 3121(a) and therefore are subject to FICA tax obligations.

The government disputes the trial court's conclusion that payments that satisfy the definition of SUB in section 3402(o) are not "wages" for purposes of FICA. In particular, the government argues that Congress could not have intended to exclude all payments falling within the definition of SUB benefits in section 3402(o) from the broad definition of "wages" in FICA based solely on an implication from language used in section 3402(o), a statute that is not part of FICA but deals with income tax withholding. To appreciate the background against which this argument is made requires some examination of the history of payments made to displaced employees, including SUB payments, and the administrative and legislative treatment of such payments under the tax laws.

C

Prior to 1950, the statutory definition of "wages" in FICA expressly excluded "[d]ismissal payments which the employer is not required to make." 26 U.S.C.

§ 1426(a)(4) (1946).  Congress changed that rule in the Social Security Amendments Act of 1950, Pub. L. No. 81-734, 64 Stat. 477, which amended FICA by eliminating the exclusion of the so-called "dismissal payments" from FICA wages.  As the House Report explained, the amended definition of the term "wages" in FICA contained no exclusion for dismissal payments comparable to the prior exclusion.  Therefore, "a dismissal payment, which is any payment made by an employer on account of involuntary separation of the employee from the service of the employer, will constitute wages . . . irrespective of whether the employer is, or is not, legally required to make such payment."  H.R. Rep. No. 81-1300, at 124 (1950).  Accordingly, as of 1950, it was clear that all payments made by an employer on account of the involuntary separation of an employee from service constituted wages within the meaning of FICA.  See Abrahamsen, 228 F.3d at 1364.

In the mid-1950s, several large American industrial employers adopted plans pursuant to collective bargaining under which the employers agreed to fund trusts that would supplement state unemployment compensation for employees who were laid off.  Those payments, denominated SUB payments, depended for their effectiveness in part on their not being characterized as "wages."  That was because unemployment benefits in a number of states were not available to employees who were earning "wages" from their employers, and the employees' loss of state unemployment benefits would largely defeat the purpose of the supplemental unemployment benefits.  Accordingly, those who adopted such SUB plans sought to ensure that the payments from those plans would not have the legal status of "wages."  See Joseph M. Becker, Guaranteed Income for the Unemployed, The Story of SUB (1968); Note, Unemployment Insurance:

Supplemental Unemployment Benefit Plans, 1962 Duke L.J. 605, 609-10; see also Coffy v. Republic Steel Co., 447 U.S. 191, 198-99 (1980). Although the payments in question were principally designed to supplement state unemployment benefits, the plans also commonly provided for benefits to be paid to employees in lieu of state unemployment benefits in states in which the laid-off employees were not eligible for state benefits. See Note, Effect of Receiving Supplemental Unemployment Benefits on Eligibility for State Benefits, 69 Harv. L. Rev. 362, 364 (1955).

In 1956, the Internal Revenue Service issued a revenue ruling, Rev. Rul. 56-249, 1956-1 C.B. 488, in which the IRS took the position with respect to a particular SUB plan that SUB payments under that plan would not be considered "wages" for purposes of FICA. The 1956 revenue ruling did not purport to establish a comprehensive test for when SUB payments would be regarded as not constituting wages, but instead set forth a number of facts relating to the plan at issue in that case and concluded that, based on those facts, the SUB payments under the plan in question did not constitute wages. The revenue ruling recited the following facts as bearing on the IRS's decision to treat the payments as SUB payments: (1) the benefits were paid only to laid-off employees, (2) they were paid from independent trust funds, (3) the amount of the payments was based on the amount of the employee's unemployment compensation benefits and the employee's weekly pay, (4) the benefits were not attributable to any particular service by the employee, (5) the employee had no right to the assets of the fund until the employee qualified for a payment from the fund, and (6) if the payment of supplemental unemployment benefits would render the employee ineligible to receive state unemployment compensation under a particular state's law, the plan would pay a

substitute benefit to the employee.  As the IRS subsequently explained, it was important that the benefits not be characterized as "wages" because "[i]f the Service had made an administrative determination that the unemployment supplements were wages, then the supplements would have defeated the goal of a de facto guaranteed annual wage by disqualifying employees from receiving the precise state benefits they were intended to supplement."  I.R.S. Tech. Adv. Mem. 94-16-003, 1993 WL 642695 (Dec. 31, 1993).

In other revenue rulings issued during the next several years, the IRS ruled that the principles of Rev. Rul. 56-249 would apply with equal force to a plan that was unilaterally instituted by the employer rather than the product of collective bargaining with a union.  See Rev. Rul. 58-128, 1958-1 C.B. 89.  The IRS also ruled that the same principles would apply to lump sum payments rather than payments made over time.  See  Rev. Rul. 59-227, 1959-2 C.B. 13.  And it ruled that payments made not through a trust, but directly from the employer to employees pursuant to a supplemental unemployment benefit plan would also fall within the rationale of Rev. Rul. 56-249.  See Rev. Rul. 60-330, 1960-2 C.B. 46.  In each of those instances, the IRS ruled that the payments were not taxable as "wages" under FICA.

In 1960, Congress enacted an amendment to section 501(c) of the Internal Revenue Code, 26 U.S.C. § 501(c), which provided a tax exemption for trusts that were used as a vehicle to pay supplemental unemployment compensation benefits.  Pub. L. No. 86-667, 74 Stat. 534 (1960).  In that statute, which was codified as 26 U.S.C. § 501(c)(17), Congress defined "supplemental unemployment compensation benefits" to mean, in pertinent part, benefits that are paid to an employee "because of his involuntary separation from the employment of the employer (whether or not such

separation is temporary) resulting directly from a reduction in force, the discontinuance of a plant or operation, or other similar conditions."

The legislative history of the 1960 statute makes clear that Congress was aware that employers had developed SUB plans in a variety of different forms. Because Congress wished to ensure tax-free status for a broad range of trusts that were used to fund payments to employees who were laid off or who suffered reductions in employment, it defined SUB benefits broadly, to include a wide range of unemployment benefits as well as benefits for related loss of employment because of sickness or accident. See S. Rep. No. 86-1518, at 2-3 (1960), as reprinted in 1960 U.S.C.C.A.N. 3203, 3204-05; H.R. Conf. Rep. No. 86-2073, at 4 (1960), as reprinted in 1960 U.S.C.C.A.N. 3203, 3211. As the Senate Report explained, it was desirable to extend tax protection to trusts that provided SUB benefits because those trusts "are non-profit in nature and provide worthwhile benefits, but at the same time are not in competition with profitmaking enterprises." S. Rep. No. 86-1518, at 3, as reprinted in 1960 U.S.C.C.A.N. 3203, 3205.

During the 1960s, SUB payments were treated, for income tax purposes, as ordinary income to the recipient, but not as wages for purposes of either the income tax withholding statutes or FICA. It soon became evident, however, that treating SUB payments in that manner was creating a problem. Because SUB payments were not treated as wages, income tax was not withheld from SUB payments that were made to employees. Yet because SUB payments were included in gross income, the failure to withhold from those payments meant that employees who received those payments

were encountering large tax obligations attributable to the SUB payments at the end of the taxable year.

In order to solve that problem, the Treasury Department suggested an amendment to the income tax withholding statutes (chapter 24 of the Internal Revenue Code, entitled Collection of Income Tax at Source on Wages). The legislation would authorize employers to withhold taxes from supplemental unemployment benefit payments. Tax Reform Act of 1969: Hearings Before the S. Comm. On Finance, 91st Cong. 905 (1969) (Technical Memorandum of Treasury Position on H.R. 13270). In response to that recommendation, Congress enacted section 3402(o) as a part of the Tax Reform Act of 1969. The new provision ensured that SUB payments, even if not deemed "wages," would be subject to income tax withholding by the employer. Section 3402(o) thus provided that any supplemental unemployment compensation benefit paid to an individual "shall be treated as if it were a payment of wages by an employer to an employee for a payroll period." 26 U.S.C. § 3402(o).

Section 3402(o) took its definition of supplemental unemployment compensation benefits almost verbatim from the 1960 tax exemption statute, section 501(c)(17). At the time of the enactment of section 3402(o), the Senate Committee report recognized that SUB payments were not subject to withholding for income tax purposes "because they do not constitute wages or remuneration for services." S. Rep. No. 91-552, at 268 (1969), as reprinted in 1969 U.S.C.C.A.N. 2027, 2305. Congress did not legislate to make them wages. Instead, as the Senate Report explained, it provided that "although these benefits are not wages . . . they should be subject to withholding to avoid the final tax payment problem for employees." Id. Accordingly, the report concluded, the

withholding requirements "applicable to withholding on wages are to apply to these non-wage payments." Id. at 269, 1969 U.S.C.C.A.N. at 2306.

During the period between 1965 and 1974, the IRS issued a series of revenue rulings in which it reiterated the longstanding principle that dismissal payments constitute wages. In the first, Rev. Rul. 65-251, 1965-2 C.B. 395, the IRS ruled that lump sum separation and severance allowances paid to laid-off employees in the railroad industry constituted "compensation" under the RRTA. In Rev. Rul. 71-408, 1971-2 C.B. 340, the IRS addressed an agreement between a union and a company under which the company undertook to make awards to employees when the employees were separated because of a termination of service. The amount of the awards was based on the employees' rate of pay and years of service. Citing the 1950 amendment to the Social Security Act and the "dismissal payment" regulation in the income tax withholding regulations,[1] the IRS ruled that those payments constituted "wages" under FICA. Three years later, the IRS reached the same conclusion with respect to a dismissal payment that was the product of a contractual arrangement between the employer and the employee to make dismissal payments if the employer terminated the employee early. Rev. Rul. 74-252, 1974-1 C.B. 287. Those three revenue rulings made no reference to the statutes pertaining to SUB payments.

In 1977, the IRS issued a revenue ruling dealing with SUB payments in the aftermath of the enactment of section 3402(o). That ruling, Rev. Rul. 77-347, 1977-2

---

[1]    See Treas. Reg. § 31.3401(a)-1(b)(4) ("Any payments made by an employer to an employee on account of dismissal, that is, involuntary separation from the service of the employer, constitute wages regardless of whether the employer is legally bound by contract, statute, or otherwise to make such payments.").

C.B. 362, noted that the employer's plan at issue in that case was "substantially the same" as the plan that had been at issue in Rev. Rul. 56-249. 1977-2 C.B. at 363. Although the plan at issue was not directly tied to the receipt of state unemployment compensation benefits, the revenue ruling pointed out that payments under the plan did not disqualify the employees from receiving state unemployment benefits. The revenue ruling then made two findings with respect to the plan at issue. First, it found that because "the supplemental unemployment plan in Rev. Rul. 56-249 and the plan in the instant case are substantially the same, the fact that benefits under the plan are not tied to the State's unemployment benefits is not a material or controlling factor." 1977-2 C.B. at 363. Second, the revenue ruling found that "[t]he payments under both plans are supplemental unemployment compensation benefits as defined in section 3402(o) of the Code." Id. Based on those two findings, the revenue ruling drew two legal conclusions:

> Accordingly, the payments from the trust received by the former employees are not "wages" for the purposes of the Federal Insurance Contributions Act and the Federal Unemployment Tax Act. Further, the payments are includible in the gross incomes of the recipients for the year in which received, and are subject to the Collection of Income Tax at Source on Wages.

Id. The revenue ruling concluded by noting that the IRS was modifying the 1956 revenue ruling "to reflect the change of the Code made by the Tax Reform Act of 1969 with regard to the Collection of Income Tax at Source on Wages." Id.

Although CSX characterizes the 1977 revenue ruling as expressly supporting its position that SUB payments, as defined in section 3402(o), are not wages for purposes of FICA, the revenue ruling does not clearly embrace that position. To the contrary, the first legal conclusion in the revenue ruling—that the payments from the trust are not

"wages" for FICA purposes—may be viewed as flowing from the finding that the plan at issue was "substantially the same" as the plan in Rev. Rul. 56-249, while the second legal conclusion—that the payments are includible in the employees' gross income and are subject to withholding under the provisions of chapter 24—may be viewed as flowing from the finding that the payments under both plans fall within the scope of section 3402(o).

The IRS subsequently embraced that interpretation of Rev. Rul. 77-347. It explained that although the plan at issue in the 1977 revenue ruling did not link the plan benefits to state unemployment compensation, the 1977 revenue ruling nonetheless emphasized that the plan benefits did not disqualify the employee from the state unemployment benefits. I.R.S. Tech. Adv. Mem. 94-16-003, 1993 WL 642695. The IRS further noted that 1977 revenue ruling described the plan in that case as "'substantially the same' as the plan in Rev. Rul. 56-249." Id. at 4, For that reason, the IRS concluded, the plan in Rev. Rul. 77-347 qualified as a SUB plan for FICA purposes, justifying the exclusion of plan benefits from "wages" under FICA.

If the 1977 revenue ruling were read as broadly as CSX contends, it would be difficult to reconcile with the 1965, 1971, and 1974 revenue rulings dealing with dismissal payments. The 1965, 1971, and 1974 rulings treated payments made by an employer in response to an involuntary termination (lay-offs in the case of the 1965 ruling, cessation of operations in the case of the 1971 ruling, and early termination of contract work in the case of the 1974 ruling) as dismissal payments and thus as "wages" for purposes of FICA. The 1977 ruling treated payments by a collectively bargained trust to employees separated because of permanent discontinuance of the

company's business or acquisition, merger, or consolidation as SUB payments for purposes of income tax withholding. If the 1977 revenue ruling stood for the proposition that all payments fitting the definition of SUB under section 3402(o) are deemed non-wages for purposes of FICA, as CSX contends, the 1965, 1971, and 1974 revenue rulings would appear to have been silently overruled. Rather than interpret the 1977 revenue ruling to have such a dramatic (but unannounced or unrecognized) effect, we think the 1977 revenue ruling is better interpreted to have the more modest effect of announcing that payments under a plan satisfying the definition of SUB in section 3402(o)(2)(A) are subject to income tax withholding, and payments under a plan having similar characteristics to the one in Rev. Rul. 56-249 are not subject to taxation under FICA.

CSX seeks to distinguish "dismissal" payments (which are wages for FICA purposes) from SUB payments under section 3402(o) (which it contends are not wages) on the ground that the SUB payments must result "from a reduction in force, the discontinuance of a plant or operation, or other similar conditions." That distinction is of no help here, however, because it is beyond dispute that the payments in this case resulted from a reduction in CSX's workforce. Nor would the distinction be of use in the large number of cases involving "buy-out" and "severance" payments accompanying force reductions or plant closings. See, e.g., Rev. Rul. 71-408, 1971-2 C.B. 340 (payments made to separated employees when company terminated operations were "dismissal" payments and thus "wages" for purposes of FICA). In this and like cases, CSX's argument regarding the 1977 revenue ruling would result in identical payments

being subject to different tax treatment depending on how the payments were characterized.

During the years between 1977 and 1990, the IRS issued a number of private letter rulings in which it approved various SUB plans, authorizing the employers to treat the SUB payments under those plans as non-wages. In explaining its reasoning in those rulings, the IRS did not suggest that the SUB payments were not taxable under FICA merely because they satisfied section 3402(o). In fact, in several of the rulings, the IRS stated separately (1) that the SUB payments at issue were not taxable under FICA because the SUB plans at issue were similar to the plan in Rev. Rul. 56-249, and (2) that the SUB payments were subject to income tax withholding because they satisfied the definition in section 3402(o).[2] Those private letter rulings therefore do not support CSX's characterization of the 1977 revenue ruling as adopting CSX's theory that the definition of SUB in section 3402(o) governed the issue of FICA taxation.

In 1989, the IRS announced that it would not issue any more private letter rulings dealing with whether SUB payments constituted wages pending further review of the issue. Rev. Proc. 89-7, 1989-1 C.B. 778. The following year, the IRS issued Rev. Rul. 90-72, 1990-2 C.B. 211, in which it set forth in detail its position as to the relationship between supplemental unemployment benefit payments that do not constitute wages under IRS revenue rulings and SUB benefits as defined by section 3402(o). In that

---

[2] See I.R.S. Priv. Ltr. Rul. 78-17-073 (Jan. 27, 1978); I.R.S. Priv. Ltr. Rul. 78-33-039 (May 17, 1978); I.R.S. Priv. Ltr. Rul. 78-45-039 (Aug. 10, 1978); I.R.S. Priv. Ltr. Rul. 79-16-044 (Jan. 17, 1979); I.R.S. Priv. Ltr. Rul. 79-39-120 (June 29, 1979); I.R.S. Priv. Ltr. Rul. 80-06-053 (Nov. 16, 1979); I.R.S. Priv. Ltr. Rul. 85-01-073 (Oct. 11, 1984); I.R.S. Priv. Ltr. Rul. 85-03-023 (Oct. 17, 1984); I.R.S. Priv. Ltr. Rul. 86-03-127 (Oct. 25, 1985); I.R.S. Priv. Ltr. Rul. 86-50-048 (Sept. 16, 1986); I.R.S. Priv. Ltr. Rul. 87-32-015 (May 7, 1987).

revenue ruling, the IRS stated that the definition of SUB payments in section 3402(o) is not applicable to FICA, and that for FICA purposes supplemental unemployment benefits are defined "solely through a series of administrative pronouncements published by the Service." 1990-2 C.B. at 211-12. Citing the 1950 legislation that extended FICA to "dismissal payments" as well as the Treasury regulation providing that "dismissal payments" constitute wages for income tax withholding purposes, Treas. Reg. § 31.3401(a)-1(b)(4), the IRS stated that in order to be exempt from inclusion within the definition of "wages" under FICA, payments made to employees involuntarily separated from the service of the employer had to be "designed to supplement the receipt of state unemployment compensation." 1990-2 C.B. at 212. The IRS further explained that because lump-sum benefits, rather than periodic payments, allow the same amount of benefits to be received no matter how long the individual remains unemployed, "benefits provided in the form of a lump sum are not considered linked to state unemployment compensation . . . and are therefore not excludable from wages as SUB pay." Id. The IRS characterized Rev. Rul. 90-72 as "restor[ing] the distinction between SUB pay and dismissal pay by re-establishing the link between SUB pay and state unemployment compensation" originally established in Rev. Rul. 56-249. 1990-2 C.B. at 213. As such, the 1990 revenue ruling stated that it was modifying the 1977 revenue ruling to the extent that the earlier ruling had allowed payments to qualify as SUB for purposes of FICA even when the payments were not tied to eligibility for state unemployment compensation.

D

The government urges us to embrace the position taken in IRS Rev. Rul. 90-72 that SUB payments are excluded from wages only when the plans in question are substantially similar to the plans reviewed in Rev. Rul. 56-249 and subsequent related rulings. The trial court rejected the government's argument. The court's analysis, embraced by CSX, consisted of two steps. First, the court ruled that the provision of section 3402(o) that states that a SUB benefit "shall be treated as if it were a payment of wages by an employer to an employee for a payroll period" implies that such a benefit is not "wages" for purposes of the income tax withholding statutes. Second, the court ruled that if a particular payment is not "wages" for purposes of the income tax withholding statutes, it must not be "wages" for purposes of FICA. Hence, the court concluded that SUB benefits, as defined in section 3402(o)(2)(A), are not wages under FICA and thus are not subject to taxation under that statute.

We acknowledge that this issue of statutory construction is complex and that the correct resolution of the issue is far from obvious. Indeed, the trial court's lucid analysis of the issue has substantial force. Nonetheless, after careful consideration we are constrained to disagree with the trial court and with CSX with regard to the proper construction of section 3402(o) as it relates to FICA.

Section 3402(o) had the effect of including SUB payments in the types of income (including conventional wages) that are subject to income tax withholding. For purposes of chapter 24 (income tax withholding), it was not important for Congress to define SUB payments narrowly or to distinguish between SUB payments and "dismissal" payments, since both were treated similarly for withholding purposes. For the same

reason, it is not surprising that the income tax withholding regulations have long contained co-existing provisions stating that dismissal payments and SUB payments (as defined in section 3402(o)) are subject to withholding, even though those two categories plainly overlap. Compare Treas. Reg. § 31.3401(a)-1(b)(4) (defining dismissal payments as "[a]ny payments made by an employer to an employee on account of dismissal, that is, involuntary separation from the service of the employer"), with id. § 31.3401(a)-1(b)(14)(ii) (defining supplemental unemployment compensation benefits as "amounts which are paid to an employee pursuant to a plan to which the employer is a party, because of the employee's involuntary separation from the employment of the employer, whether or not such separation is temporary, but only when such separation is one resulting directly from a reduction in force, the discontinuance of a plant or operation, or other similar conditions"). Under those regulations, not all dismissal payments would constitute SUB payments, but all SUB payments would qualify as dismissal payments. Yet the overlap between those two categories has presented no difficulties in the context of chapter 24, because the same consequence ensues—withholding—regardless of which category a particular payment is deemed to fall within.

The overlap between those two categories does cause problems, however, if section 3402(o) is construed to apply outside of chapter 24, such as to chapter 21 (FICA), chapter 22 (the RRTA), and chapter 23 (the Federal Unemployment Tax Act. Thus, if section 3402(o) is deemed to render all SUB payments (as defined therein) non-wages, and if the non-wage character of SUB payments (as so defined) is deemed to apply to FICA, it creates a square conflict with the treatment of dismissal payments as wages under FICA since 1950 and in decisions of this court and others. See

Abrahamsen v. United States, 228 F.3d 1360 (Fed. Cir. 2000); Greenwald v. United States, 2000 WL 16939 (S.D.N.Y. Jan. 10, 2000); McCorkill v. United States, 32 F. Supp. 2d 46 (D. Conn. 1999); Meehan v. Comm'r, 122 T.C. 396 (2004).  That potential conflict argues against reading section 3402(o) to suggest that all payments falling within the statutory definition of SUB must be deemed non-wages for FICA purposes.

Nothing in the text of section 3402(o) requires that the statute be read to go that far.  Section 3402(o)(1) provides that the general rule that SUB payments shall be treated as if they were payments of wages applies only for purposes of chapter 24 and certain procedural provisions relating to chapter 24.  Congress's decision to restrict the scope of the rule set forth in section 3402(o) to chapter 24 suggests that Congress did not intend that rule, or any implication that might be drawn from that rule, to be applied outside the context of income tax withholding.

Limiting the rule of section 3402(o) to the context of income tax withholding makes sense in light of the purpose served by that provision.  As noted above, because section 3402(o) resulted in adding SUB payments to other payments that were subject to withholding, it was not important to distinguish between SUB payments that constituted wages (such as dismissal payments) and those that did not (such as payments covered by Rev. Rul. 56-249).  Similarly, because Congress wished to ensure that trusts used for making SUB payments would be able to operate tax-free, defining SUB payments broadly for purposes of section 501(c)(17) had the effect of avoiding disputes over whether particular trusts qualified as SUB trusts.  Congress's subsequent decision to apply the section 501 definition of SUB for purposes of section 3402(o) did not affect the status of those payments as gross income, and it assured that the

statutory definition would not be the source of disputes over whether such payments would be subject to withholding on the same basis as wages.

CSX argues that even though the rule governing the treatment of SUB payments as defined in section 3402(o)(2)(A) is expressly limited to chapter 24, the implication of that rule cannot be so confined. Thus, while the definition of SUB in section 3402(o) is not directly applicable to FICA, CSX argues that the section 3402(o) definition applies to FICA through a more indirect route. CSX's reasoning goes as follows: Because section 3402(o) provides that SUB payments "shall be treated as if they were wages," they must not be wages for purposes of the definition of wages in section 3401. If SUB payments are not wages for purposes of section 3401, they cannot be wages for purposes of section 3121 (FICA).

1

As to the first proposition, the statement that a SUB payment, as defined in section 3402(o), "shall be treated as if it were a payment of wages by an employer to an employee for a payroll period" does not imply that all payments satisfying the definition of SUB in section 3402(o)(2)(A) are non-wages, even for purposes of chapter 24. It is undisputed that some SUB payments—in particular, those described in Rev. Rul. 90-72 and Rev. Rul. 56-249—are not wages. CSX argues that saying that all SUB payments within the definition of section 3402(o) must be "treated as if" they were payments of wages necessarily implies that no such payments are in fact wages.

We disagree. To say that all payments falling within a particular category shall be treated as if they were a payment of wages does not dictate, as a matter of language or logic, that none of the payments within that category would otherwise be wages. For

example, to say that for some purposes all men shall be treated as if they were six feet tall does not imply that no men are six feet tall. Moreover, section 3402(o) does not simply say that SUB payments shall be treated as wages; it provides that SUB payments shall be treated as if they were "a payment of wages by an employer to an employee for a payroll period." To say that certain payments do not constitute a payment of wages for a payroll period falls short of saying that the payments lack the legal character of "wages" altogether. In sum, the inference that CSX seeks to draw from the statutory language is simply too strained. Thus, while some supplemental unemployment benefit payments do not constitute "wages," it does not follow that all payments fitting within the broad definition of SUB in section 3402(o)(2)(A) are non-wages.[3] We therefore conclude that the text of section 3402(o) does not require that FICA be interpreted to exclude from "wages" all payments that would satisfy the definition of SUB in section 3402(o)(2)(A).

2

CSX's second proposition—that the term "wages" must be interpreted to mean the same thing in FICA as it does in the income tax withholding statutes—is based principally on the Supreme Court's decision in Rowan Companies v. United States, 452 U.S. 347 (1982). In that case, the Court concluded that in light of the parallel language

---

[3] The same point applies to CSX's argument that the heading of section 3402(o), "Extension of withholding to certain payments other than wages," implies that all the payments encompassed within that subsection are non-wages. The point of the subsection is to extend withholding to certain payments not previously covered, i.e., non-wages. The fact that the subsection contains a definitional provision that includes some payments that would already be covered as wages does not belie the heading of the subsection or require that all of the payments covered by the subsection be converted into non-wages.

of the two definitional sections, Congress can be assumed to have intended the definition of "wages" in FICA to be the same as the definition of "wages" in the income-tax withholding statutes. The specific holding of the Court in Rowan was that certain Treasury Department regulations that interpreted the term "wages" differently for purposes of income tax withholding and FICA were invalid. The Rowan Court noted the congressional purpose of coordinating the income tax withholding system with FICA, and explained that contradictory interpretations of the same term in the two statutes would not serve that interest: "It would be extraordinary for a Congress pursuing this interest to intend, without ever saying so, for identical definitions to be interpreted differently." 452 U.S. at 257. Based on Rowan, the trial court concluded that the term "wages" must be accorded the same meaning in both the income tax statutes and in FICA.

The government argues that Congress has rejected the principle that the term "wages" must be interpreted in pari materia in the income tax withholding statutes and in FICA. In particular, the government contends that in 1983 Congress legislatively overruled Rowan and "decoupled" FICA and the income tax statutes in that respect. The statute on which the government relies is a provision from the Social Security Amendments of 1983, Pub. L. No. 98-21, 97 Stat. 65, a massive piece of legislation designed to implement reforms to the social security system recommended by the National Commission on Social Security Reform. The particular legislative change on which the government relies was designed to address the Supreme Court's decision in Rowan. The change, which was introduced in the late stages of the preparation of the bill, was described in the committee reports as having two purposes. First, it was

intended to codify the specific holding of <u>Rowan</u>, that the value of meals and lodging furnished to an employee for the convenience of the employer does not constitute wages for FICA and income tax purposes.  At the same time, it was intended to disavow the broader principle of <u>Rowan</u>, that the term wages for income tax purposes must be interpreted in the same manner as the term wages for purposes of FICA.

The committee reports on the 1983 statute clearly state that the amendment was designed to ensure that the rules applicable to income tax withholding would not necessarily apply equally to FICA.  Both the House and Senate committees, noting the difference between the social security system and the income tax system, explained that the purpose of the bill was to ensure that the determination of whether payments are included within "wages" for FICA purposes would not be dictated by whether the same payments would be treated as "wages" for income tax purposes:

> The social security program aims to replace the income of beneficiaries when that income is reduced on account of retirement and disability. Thus, the amount of "wages" is the measure used both to define income which should be replaced and to compute FICA tax liability.  Since the security system has objectives which are significantly different from the objective underlying the income tax withholding rules, the committee believes that amounts exempt from income tax withholding should not be exempt from FICA unless Congress provides an explicit FICA tax exclusion.

> [The bill] provides that, with the exception of the value of meals and lodging provided for the convenience of the employer, the determination whether or not amounts are includible in the social security wage base is to be made without regard to whether such amounts are treated as wages for income tax withholding purposes.  Accordingly, an employee's "wages" for social security tax purposes may be different from the employee's "wages" for income tax withholding purposes.

S. Rep. No. 98-23, at 42 (1983), <u>as reprinted in</u> 1983-2 U.S.C.C.A.N. 183; H.R. Rep. No. 98-25, at 80 (1983), <u>as reprinted in</u> 1983-2 U.S.C.C.A.N. 299; <u>see also</u> H.R. Conf.

Rep. No. 98-47, at 148 (1983), as reprinted in 1983-2 U.S.C.C.A.N. 438 ("the determination of whether or not amounts are includible in the social security wage base is to be made without regard to whether such amounts are treated as wages for income tax withholding purposes"); John A. Svahn and Mary Ross, Social Security Amendments of 1983: Legislative History and Summary of Provisions, 46 Soc. Sec. Bull. No. 7, at 13 (July 1983) (observation by the Commissioner of Social Security that the amendment addressing Rowan "provides a clear statutory precedent for different treatment of the same income for Internal Revenue Service and Social Security purposes").

The problem is that, although the committee reports clearly state the intention to decouple the term "wages" for purposes of income tax withholding and FICA, the statutory language does not have that effect. The pertinent language, which was added to section 3121 of FICA (and later to the corresponding section of the RRTA, Pub. L. No. 101-239, § 10207(b), 103 Stat. 2476 (1989)), reads as follows:

> Nothing in the regulations prescribed for purposes of chapter 24 (relating to income tax withholding) which provides an exclusion from "wages" as used in such chapter shall be construed to require a similar exclusion from "wages" in the regulations prescribed for purposes of this chapter.

26 U.S.C. § 3121(a). That language addresses the construction of the regulations rather than chapter 24 itself; as CSX points out, it does not state that the term "wages" in section 3401 will be defined independently from the term "wages" in section 3121.

Moreover, this court in Anderson v. United States, 929 F.2d 648 (Fed. Cir. 1991), rejected the same argument that the government is making here. In that case, the court held that the term "including benefits" in the definition of wages under FICA must be accorded the same meaning as the identical term used in the income tax statutes. In

the course of its opinion, the court rejected the government's argument that the 1983 amendment to section 3121 had the effect of decoupling the meaning of "wages" in FICA from the meaning of the same term in the income tax withholding statutes. The court explained that the statute "decoupled" the two only to the extent of "allowing Treasury to promulgate regulations to provide for different exclusions from 'wages' under FICA than under the income tax withholding laws." 929 F.2d at 650; see also id. at 653 n.10 ("The SSA amendment provided for treating 'wages' in both statutes differently, but only through exclusions promulgated by regulation."). The court noted that there was "no regulation pointed to which indicates that any different effect is to be attributed to '(including benefits)' as between the FICA and income tax withholding statutes." Id. Accordingly, the court concluded that it was "constrained to interpret the '(including benefits)' language" in the same fashion in both statutes. Id.[4]

In light of the lack of congruence between the legislative history and the statutory text of the 1983 amendment, and this court's rejection of the government's "decoupling" argument in Anderson, we disagree with the government's argument that after 1983, the term "wages" in FICA must be interpreted without reference to the same term in the income tax withholding statutes. However, because we have rejected the first part of

---

[4]    The government cites the recent Supreme Court decision in Environmental Defense v. Duke Energy Corp., 127 S. Ct. 1423 (2007), in support of its argument. In that case, the Court discussed Rowan and explained that Rowan relied on a manifest "congressional concern for the interest of simplicity and ease of administration." Duke Energy, 127 S. Ct. at 1433, quoting Rowan, 452 U.S. at 255. While that concern may be less compelling in other statutory settings, such as the one at issue in the Duke Energy case, there is nothing in the Court's opinion in that case to suggest that it would take a different view of the relationship between chapter 24 and chapter 21 of the Internal Revenue Code, where the Rowan Court found an enhanced need for consistency.

CSX's argument—that the reference to the term "wages" in section 3402(o) necessarily implies that all payments falling within the definition of SUB in that subsection are non-wages, we reject CSX's statutory argument. Based on that analysis, we disagree with the trial court's conclusion that all payments that qualify as SUB under the statutory definition in section 3402(o)(2)(A) are non-wages for purposes of FICA. We therefore reverse those portions of the trial court's judgment that were based on the trial court's adoption of that theory of the case.

CSX has not argued that, apart from the application of section 3402(o), its payments would satisfy the IRS's administrative exclusion of SUB benefits from wages under Rev. Rul. 90-72 and its predecessors, as the IRS has construed and applied those rulings. Moreover, the government stated both in briefing and in oral argument that CSX has not contended that any of the payments at issue in this case would qualify for exemption from employment taxes under the governing IRS revenue rulings going back to Rev. Rul. 56-249, and CSX has not contradicted the government's assertion. We therefore conclude that CSX has failed to establish that its payments were free from FICA and RRTA taxation on the ground that they constituted qualifying supplemental unemployment benefits.

III

Apart from its principal contention that section 3402(o) dictates that all SUB payments under that section are non-wages, CSX raises several independent arguments in support of its contention that the particular classes of payments among those at issue in this case are not wages for purposes of FICA and are not compensation for purposes of the RRTA. First, CSX argues that the separation

allowances it made to unionized employees in connection with its workforce reductions were not "remuneration for employment," 26 U.S.C. § 3121(a) (FICA), or "money remuneration paid to an individual for services rendered as an employee," id. § 3231(e)(1) (RRTA), and therefore were not taxable under either regime.

The separation allowances consisted of lump sum payments made to employees who agreed to leave their jobs. The separation payments were not wages, according to CSX, because the payments "had their origins in the cessation, not the performance, of services." CSX distinguishes several of the cases relied on by the government to argue that such payments constitute wages, on the ground that in those cases the amount of the payments was tied to factors such as the employees' rate of pay and length of service with the employer, whereas the amounts of the separation allowances in this case were negotiated for each class of employees without regard to the circumstances of each individual employee's service to the company.

Relying on the Supreme Court's decision in Central Illinois Public Service Co. v. United States, 435 U.S. 21, 29 (1978), CSX argues that the mere fact that payments are made "in the context of the employer-employee relationship" does not dictate that they be considered wages. That case involved the question whether lunch reimbursements constituted wages; the Court held that they did not. In reaching that conclusion, the Court relied heavily on the fact that for many years after the creation of the withholding system in 1942, no Treasury regulations or IRS revenue rulings had treated meal reimbursements as wages. See id. at 32.

By contrast to the reimbursements involved in Central Illinois Public Service Co. and several other cases on which CSX relies, this case involves dismissal payments.

As discussed above, it has been clear since the 1950 amendment to FICA that dismissal payments occasioned by involuntary separations constitute wages under FICA. A Treasury regulation under chapter 24 expressly so provides. Treas. Reg. § 31.3401(a)-1(b)(4). Although CSX argues that the rule that "dismissal" payments constitute wages should be limited to payments made in the case of involuntary dismissals, both precedent and policy indicate otherwise.[5] In particular, this court has held that dismissal or severance payments constitute wages regardless of whether the employee's separation is considered voluntary or involuntary. See Abrahamsen, 228 F.3d at 1361, 1364; see also Agar v. Comm'r, 290 F.2d 283, 284 (2d Cir. 1961). That rule reflects the IRS's administrative practice. See Rev. Rul. 75-44, 1975-1 C.B. 15 (lump sum payment received as consideration for employee's relinquishment of his employment rights is subject to employment tax); I.R.S. Tech. Adv. Mem. 97-17-001, at *14, 1997 WL 200902 (1997) ("an ordinary severance payment . . . is wages for employment tax purposes"); I.R.S. Priv. Ltr. Rul. 83-44-037 (July 29, 1983) (severance payment that does not satisfy a statutory exception under section 3121 constitutes "wages"); Dep't of the Treasury, FICA Taxation of Amounts Under Employee Benefit Plans, 61 Fed. Reg. 2194, 2196 (Jan. 25, 1996) (proposed regulations referring to "the long-established FICA tax treatment" of severance pay). It also makes good sense as a policy matter, because the question whether a particular payment constitutes "wages" depends on the reason for the payment, and the reason the payment is made does not

---

[5]     We note that there is some tension between CSX's argument that "dismissal" payments include only payments made pursuant to involuntary separations, and its argument for purposes of section 3402(o) that all of the separations in this case were involuntary.

depend on whether the options before the employee are such that he feels free to accept or decline the payment, feels that he has little choice but to accept it, or feels that his situation is somewhere in between those extremes. See Note, The Wages of Not Working: FICA Liability for Severance Payments in Associated Electric Cooperative, Inc. v. United States, 54 Tax Law. 811, 818-19 (2001) (approving same treatment for voluntary and involuntary dismissal payments; "[a]s in other cases of severance payments, the taxpayer offered a voluntary severance plan for the same reason as it offered an involuntary severance plan: to reduce its workforce consistent with its changing labor needs.").

CSX argues that the separation payments held to be "wages" in Abrahamsen and Associated Electric Cooperative, Inc., 226 F.3d 1322 (Fed. Cir. 2000), can be distinguished from the separation allowances at issue in this case, because in both Abrahamsen and Associated Electric the amount of the payments was based in part on each employee's rate of pay and length of service with the employer, which is not true of the separation allowances in this case. Yet, while it is true that in both Abrahamsen and Associated Electric the amount of the severance payments at issue were based in part on the departing employees' salary and years of service, in neither case did the court treat that fact as controlling. Instead, those cases treated that fact as further support for the conclusion that the payments at issue were wages.

Moreover, in Abrahamsen the court looked at the method of determining the amount of the severance payment in question because it was addressing an argument that CSX has not made here. The plaintiffs in Abrahamsen argued that the severance payments were not wages because they were made for the purpose of settling potential

personal injury lawsuits. Id. at 1364. The court rejected their argument, however, because there was no evidence in the record that the employees had ever made any personal injury claims against IBM or informed IBM of any claims that they might assert. Id. at 1365. The court further supported its conclusion that the payments were wages, and not payments for the settlement of claims, by noting that the payment amounts were based on the departing employees' salary and years of service. Id. In drawing the distinction between wages and settlement payments, the court relied on two cases from other circuits that examined awards paid to former employees as part of a settlement agreement for a class action suit under ERISA, and found those awards to be wages. Mayberry v. United States, 151 F.3d 855 (8th Cir. 1998), and Hemelt v. United States, 122 F.3d 204 (4th Cir. 1997). In Hemelt, the Fourth Circuit stated that the method of calculating the settlement awards supported the conclusion that the settlement awards were wages rather than "tort-based awards" because the amount of payments were based on the former employees' salary and length of service. 122 F.3d at 210. Following Hemelt, the Eighth Circuit in Mayberry rejected the plaintiffs' argument that the settlement awards were not wages because the class members had already been fully compensated for all services rendered. 151 F.3d at 860.

In Associated Electric, the court relied on Mayberry and Hemelt for the proposition that the method of calculating the "early out" payments at issue was "a relevant factor in determining whether the payments constitute 'wages.'" 226 F.3d at 1328. The court additionally relied on the holding in Lane Processing Trust v. United States, 25 F.3d 662, 664 (8th Cir. 1994), which rejected the plaintiffs' argument that the distribution of funds to employees from a company trust was a distribution of the

employees' ownership interest in the fund rather than a payment of wages. Because each employee's distribution was based on the employee's job and length of employment, the court rejected the argument that "the distributions were the fruits of ownership." Id. at 665. As shown by Abrahamsen, Associated Electric, and the opinions on which those two cases relied, the structure of payments to employees can be useful in determining whether those payments are wages, or whether they should be considered something other than wages. In this case, however, CSX does not assert that the separation allowances to the unionized employees were anything other than payments to encourage the employees to end their employment relationship with the company.

CSX has asserted that the method of calculating the payments alone weighs against finding the payments to be wages. As explained above, the method of calculating payments can be a useful factor in determining whether the payments should be characterized as something other than wages. CSX, however, has not explained why severance payments that are intended to induce employees to give up their employment rights must reflect the employees' prior service and salary in order to constitute wages. Indeed, this court and others have found severance payments to be wages when the payments were offered primarily to induce an employee to leave his employment. In Abrahamsen, the court noted that the exit-incentive payments that it found to be wages were "designed to reduce IBM's overall workforce." 228 F.3d at 1361; see also Associated Elec., 226 F.3d at 1327 ("Associated recognized that it was attempting to induce employees to resign in an economic climate where other employment was not readily available."); Abbott v. United States, 76 F. Supp. 2d 236

(N.D.N.Y. 1999), aff'd, 231 F.3d 889 (2d Cir. 2000) (payments to induce employees to resign were taxable "wages"); Cohen v. United States, 63 F. Supp. 2d 1131, 1134-36 (C.D. Cal. 1999) (payments in consideration for employee's early retirement as part of a company's cost-cutting severance plan were "wages" under FICA); Greenwald v. United States, 2000 WL 16939, at *4 (S.D.N.Y. Jan. 10, 2000) (severance payment to manager whom employer wanted to replace was taxable under FICA); Meehan v. Comm'r, 122 T.C. 396, 401 (2004) ("[S]everance pay is itself a form of compensation. It is paid by the taxpayer's employer as compensation for termination of the employer-employee relationship."); see also Rev. Rul. 75-44, 1975-1 C.B. 15; I.R.S. Priv. Ltr. Rul. 93-31-007 (May 5, 1993).

A separation payment may be designed to induce the employee to leave or to cushion the effect of a separation, as was true in Abrahamsen and Associated Electric, but that does not deprive the payment of its character as wages under the broad definition of that term for purposes of FICA. We therefore agree with the trial court that the separation allowances to the unionized employees constituted taxable wages and compensation.

IV

CSX next makes the related argument that the separation allowances to the unionized employees are not wages because they were made in exchange for the employees' agreement to surrender their contract rights to employment and therefore are properly viewed not as wages but as the proceeds of an exchange of property. That argument is based principally on the Eighth Circuit's decision in North Dakota State University v. United States, 255 F.3d 599 (8th Cir. 2001).

In North Dakota State, certain tenured faculty members as well as nontenured administrators agreed to accept payments in exchange for opting in favor of early retirement. The IRS treated the payments as wages. On appeal, the court held that the payments to the nontenured administrators were wages subject to FICA, but it ruled differently as to the tenured faculty members. As to that group, the court held that the payments were made in exchange for the relinquishment of the faculty members' tenure rights and therefore were not "wages" because they did not consist of remuneration for services rendered to the university.

CSX argues that, as in North Dakota State, the unionized employees in this case gave up certain employment rights, such as rights under the collective bargaining agreement, when they agreed to accept the separation allowances as part of a "buyout" arrangement offered by CSX. Accordingly, CSX argues, those payments were not "wages," but were contractual exchanges of property.

Arguments akin to CSX's based on North Dakota State have been rejected by this court and by every other court that has addressed them. The decisions that have addressed the ruling in North Dakota State have characterized that case as limited to the special situation of university tenured faculty members surrendering their tenure rights. In Associated Electric Cooperative, Inc. v. United States, 226 F.3d 1322, 1328 (Fed. Cir. 2000), this court rejected the argument that severance payments made to union members were made in exchange for valuable rights, such as the union's right to strike, and thus were not payments for services performed. The court agreed that securing the union's agreement not to strike was critical to the agreement, but that "Associated was motivated to offer the early out plan first and foremost on the basis of

economic benefits." Id. Notwithstanding that Associated entered the agreement for reasons other than rewarding employees for services rendered, the court nonetheless concluded that the payments fit within the statutory definition of "wages." Id. at 1328-29.

As we have noted, severance payments made to induce employees to relinquish employment-related rights are considered wages. See Abrahamsen, 228 F.3d at 1364-65 (payments under early-out plans constituted wages). Even in the context of surrender of tenure rights, courts other than the North Dakota State court have held that severance payments to tenured employees who have given up their tenure rights constitute "wages" for FICA purposes. See Univ. of Pittsburgh v. United States, 507 F.3d 165 (3d Cir. 2007); Appoloni v. United States, 450 F.3d 185 (6th Cir. 2006). As the Sixth Circuit explained in Appoloni,

> We fail to see how this is different from other severance packages just because a "tenure" right was exchanged. In almost all severance packages an employee gives up something, and we have a hard time distinguishing this case from similar cases where an employee, pursuant to a severance package, gives up rights in exchange. Courts have consistently held that severance payments for the relinquishment of rights in the course of an employment relationship are FICA wages.

450 F.3d at 193.

Based on the analysis in Abrahamsen and in the court of appeals opinions cited above, we agree with the trial court that none of the payments at issue in this case constituted the proceeds of a sale of property or an analogous transaction. The payments therefore cannot be deemed non-wages on that rationale.

V

CSX argues that the payments made to employees in the groups referred to as "guaranteed extraboards" and "reserve pools" were SUB payments and not wages.

Employees in those groups had their full-time positions eliminated but remained subject to recall on an as-needed basis. As such, they remained on CSX's active service payroll and were guaranteed a certain minimum compensation per pay period, adjusted by the amounts they were paid for work actually performed. The trial court held that those payments were not SUB payments even under section 3402(o), because those employees were not separated from employment with the employer and therefore concluded that the payments were not wages.

In light of our analysis above, even if the extraboard and reserve pool payments satisfied the definition of SUB in section 3402(o) that would not keep them from being taxable as "wages" and "compensation" under FICA and the RRTA. In addition, however, there are clear indications in statute and regulation that such payments were intended to be subject to employment taxation.

By regulation, the Treasury Department has characterized such payments as taxable under the RRTA. Section 31.3231e-1(a)(4) of the RRTA regulations provides that "compensation" under the RRTA "includes amounts paid to an employee for loss of earnings during an identifiable period as the result of displacement of the employee to a less remunerative position or occupation." Treas. Reg. § 31.3231e-1(a)(4). That provision describes the situation of the "guaranteed extraboard" and "reserve pool" employees. CSX argues that extraboard and reserve pool employees are not covered by that regulation because the regulation was designed for employees who were assigned from one full-time job to another less remunerative full-time position. By its terms, however, the regulation is not so narrow; the payments in this case were clearly designed to cushion the effect of the loss of income for employees who went from a full-

time position to a position that offered them fewer hours and, correspondingly, less pay. The part-time position was a "less remunerative position," and thus the payments are covered by the regulation.

Moreover, Congress has made clear that such payments constitute wages under FICA. In 1950, Congress created a limited exception from FICA taxation for certain employees who were paid for being on "stand-by" status. Social Security Act Amendments of 1950, Pub. L. No. 81-734, § 203(a), 64 Stat. 477, 526-27. In 1983, Congress repealed that limited exclusion from FICA taxation. See Social Security Amendments of 1983, Pub. L. No. 98-21, § 324(a)(3)(B), 97 Stat. 65, 123. Both the creation of the exclusion and its subsequent repeal make clear that, absent special statutory exemption, such payments are considered wages for FICA purposes. Although CSX points to several private letter rulings from the 1980s in which the IRS treated "short-week" benefits as non-wages for FICA purposes, see Priv. Ltr. Rul. 85-06-018 (Nov. 8, 1984); Priv. Ltr. Rul. 86-10-027 (Dec. 9, 1985); Priv. Ltr. Rul. 87-36-030 (June 8, 1987), we agree with the trial court that those rulings are not persuasive in light of the statutory and regulatory provisions that support a contrary conclusion.

VI

CSX next argues that the IRS acted arbitrarily and discriminatorily when it revoked a private letter ruling regarding the status of certain payments made to nonunion employees who agreed to leave the company. As a result, CSX contends, the IRS should be barred from collecting the taxes attributable to those payments.

In June 1987, CSX introduced a "Severance Pay Plan" for management employees as part of its overall workforce reduction plan. The plan gave management

employees several payment options if they agreed to terminate their employment: a lump-sum payment equal to one year's salary; a number of monthly salary payments (and continuation of fringe benefits), depending on the employee's length of tenure with the company; and an enhanced pension benefit. Shortly before the deadline for employees to apply for that program, CSX sought a private letter ruling qualifying the payments as not subject to FICA taxation.

The IRS withheld issuing the private letter ruling until after it issued Rev. Rul. 90-72. It then issued a private letter ruling in which it advised CSX that the payments under its plan did not qualify as SUB payments in light of that revenue ruling because they were not linked to the receipt of state unemployment compensation benefits and also because the benefits were offered in the form of a lump-sum payment. However, the IRS provided in the letter ruling that because Rev. Rul. 90-72 was made prospective only, the pre-1990 benefits would not be subject to employment taxation. I.R.S. Priv. Ltr. Rul. 90-50-061 (Sept. 20, 1990). The following year, the IRS advised CSX that it had reconsidered the private letter ruling and that it had erred when it initially characterized the CSX plan as providing for SUB pay. Nonetheless, the IRS stated that it had decided not to retroactively revoke the private letter ruling. The IRS pointed out, however, that the private letter ruling applied only to the approximately 800 nonunion employees who had voluntarily elected to separate from service in 1987 and that the Service was under no obligation to apply the private letter ruling more broadly.

The following year, the IRS changed its position once again and this time decided to revoke the private letter ruling retroactively. The reason given was that the representations on which the private letter ruling was based did not reflect an accurate

statement of the material facts. In particular, the IRS concluded that CSX had not advised it that the recipients of the benefits in question were disqualified from receiving government unemployment benefits, which prevents the plan from qualifying as a SUB payment plan. The IRS stated that CSX's failure to reveal that fact in its ruling request was an omission of a material fact that justified the retroactive revocation of the private letter ruling. I.R.S. Tech. Adv. Mem. 94-16-003, 1993 WL 642695 (Dec. 31, 1993).

In the trial court and here, the government has acknowledged that the particular factual basis that the IRS invoked for retroactively revoking the private letter ruling was incorrect. Nonetheless, the trial court held that the revocation was not arbitrary or discriminatory, because it correctly denied CSX a benefit that neither it nor any other taxpayers were entitled to under the law. Because CSX did not rely on the letter ruling, which was issued long after CSX paid the taxes on the separation payments, the court concluded that revocation of the ruling left CSX in no worse position than if the ruling had not been issued in the first place.

The parties do not dispute that while the IRS can elect to make the revocation of a private letter ruling prospective only, it has the statutory authority to revoke or modify a ruling retroactively in order to correct a mistake of law, even if the taxpayer has relied on the erroneous ruling to its detriment. See Dickman v. United States, 465 U.S. 330, 343 (1984); Dixon v. United States, 381 U.S. 68, 72-75 (1968). Thus, if the IRS's position with respect to the taxation of the payments was correct, the IRS was plainly authorized to revoke its private letter ruling retroactively in this case. The only question is whether it did so in a manner that improperly discriminated against CSX as compared with other similarly situated taxpayers.

The trial court correctly held that CSX was not entitled to the favorable tax treatment that the private letter ruling would have accorded it. For one thing, regardless of the outcome of the dispute over whether SUB payments under section 3402(o) are non-wages for purposes of FICA, the payments at issue under the private letter ruling would not be affected, because those separations were voluntary, and thus the payments could not qualify as SUB benefits under any standard. In any event, the payments disqualified the recipients from receiving state unemployment benefits; the plan was thus different in that respect from the plans at issue in both Rev. Rul. 77-347 and Rev. Rul. 56-249.

Moreover, the decision to apply the revocation retroactively was consistent with IRS practice with respect to completed transactions, such as the 1987 payments at issue here. By regulation, the Treasury Department has provided that the IRS will rarely revoke a private letter ruling retroactively if the ruling was issued with respect to a proposed transaction and the taxpayer acted in good faith detrimental reliance on the ruling. Treas. Reg. § 601.201(l)(5). However, where the ruling issues after the fact with respect to a completed transaction, as was the case here, the regulation provides that "taxpayers will not be afforded protection against retroactive revocation . . . since they will not have entered into the transactions in reliance on the rulings." Id. § 601.201(l)(9).

Finally, as the trial court noted, CSX has not pointed to any competitors who were given preferred treatment under private letter rulings that were not revoked. Although CSX notes that some private letter rulings had given favorable tax treatment to severance payments in the automobile industry, none of the other industry letter rulings involved post-transaction advice, but instead involved parties that relied to their

detriment on the private letter rulings. Under these circumstances, we agree with the trial court that it was not an abuse of discretion for the IRS to give retroactive effect to its revocation of the 1990 private letter ruling dealing with separation allowances to CSX's non-unionized employees.

VII

In summary, we reverse the trial court's holding that payments falling within the definition of supplemental unemployment benefits under section 3402(o) are non-wages. To the contrary, the payments to the various groups of employees who were accorded benefits in connection with CSX's reduction in force were all "wages" or "compensation" as those terms are used in FICA and the RRTA.

The employees who were placed in layoff status received benefits that represented a fixed percentage of their average monthly compensation; the duration of the payments was governed by each employee's length of service with the employer. As such, the payments were similar to the payments at issue in Abrahamsen, which this court held were wages. We reverse the trial court's ruling that those payments were not wages because they qualified as SUB payments under section 3402(o).

The separation payments made to non-management employees, whether on lay-off status or otherwise, who chose to sever their relationship with CSX constituted wages. Again, those payments were dismissal or severance payments of the sort that have consistently been treated as wages for FICA purposes. We affirm the trial court with respect to those separation payments that the court held to be wages and reverse as to those payments that the court held not to be wages.

The payments to management employees who were separated from employment, either voluntarily or involuntarily, were also wages. Those payments constituted dismissal or severance payments that were closely analogous in character to the dismissal payments that were held to be wages in Abrahamsen. Because the trial court held that some of the payments in this group constituted wages and some did not, we affirm the trial court's judgment in part and reverse in part.

Finally, we hold that the payments made to employees whose full-time positions were eliminated but who continued to be employed by the company were wages and were subject to employment taxation. We affirm the trial court's ruling as to those payments.

Because our disposition of the issues presented in this appeal appears to resolve all the substantive aspects of the dispute between the parties in this case, we remand to the trial court for the entry of judgment and resolution of any ancillary matters that may be necessary.

Each party shall bear its own costs for this appeal.

<u>AFFIRMED IN PART, REVERSED IN PART, and REMANDED</u>.